**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Kelvin STEELE, Defendant–Appellant.**

No. 00–10361.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 11, 2002.

Filed Aug. 9, 2002.

908

Gail R. Weinheimer and Ioana R. Mondescu, Law Offices of Gail R. Weinheimer, San Anselmo, CA, for the plaintiff-appellant.

Robin L. Harris, Assistant United States Attorney, San Francisco, CA, for the defendant-appellee.

Before HUG, CUDAHY,* and TASHIMA, Circuit Judges.

## OPINION

CUDAHY, Circuit Judge.

Kelvin Steele was convicted of armed robbery, in violation of 18 U.S.C. § 2113(a) and (d); using and carrying a firearm during a crime of violence, in violation of 18 U.S.C. § 924(c)(1); and being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). He was sentenced to 235 months in jail. He now appeals his conviction on the grounds that: (1) the district court gave a coercive *Allen* charge, (2) the government committed prosecutorial misconduct during the voir dire and (3) the government improperly used a peremptory challenge. We affirm.

## I.

On August 9, 1999, a Bank of America branch in San Francisco was robbed by a man wearing a white mask, blue and white jumpsuit, black pants, white shoes and carrying a blue shoulder bag. A government witness, a teller, Leonard Liu, testified that the robber used a silver gun to threaten the bank tellers. The robber proceeded to take cash from Liu's cash drawer, including $400.00 in bait money and an electronic surveillance device (ESD). He then took additional cash from another teller's drawer. Liu was able to identify the robber as an African–American because he saw black skin through the eyeholes of the mask. When she became aware of the robbery, another Bank of America employee, Maribel Gonzalez, pressed her hand held alarm, activating the cameras and alarm system. The police responded to the alarm and arrived on the scene about five minutes later. They activated a tracking device, known as the RAT pack, which tracked the ESD and led the police to the location of the bait bills.

The RAT pack directed the police officers to the corner of Geary and Presidio where they first saw Steele, dressed in black and carrying a blue bag. The officers followed Steele into the Muni barn, which was located at this intersection, and apprehended him in an upstairs room. One officer conducted a pat-down search while the other searched the immediate area. In the course of the area search, the officer found a bag. Inside the bag there was a gun and some U.S. currency, including the bait bills containing the tracking device. Steele was promptly arrested.

In San Francisco, a grand jury returned a three count indictment charging Steele with armed robbery, using and carrying a firearm during and in relation to the armed robbery and being a felon in possession of a firearm. After a five-day jury trial, Steele was convicted on all three counts and he was sentenced to a prison term of 235 months followed by five years of supervised release. Steele appeals his conviction.

## II.

This court has jurisdiction under 28 U.S.C. § 1291 since this is an appeal from a final judgment of a district court. We review for an abuse of discretion the district court's decision to deliver an *Allen* charge. *United States v. Daas*, 198 F.3d 1167, 1179 (9th Cir.1999). "This court must uphold the district court's decision unless the record makes it clear that the *Allen* charge had a coercive effect on the

---

* The Honorable Richard D. Cudahy, Senior United States Circuit Judge for the United States Court of Appeals for the Seventh Circuit, sitting by designation.

jury." *Id.* When the defendant objects to alleged prosecutorial misconduct, the standard of review is abuse of discretion. *United States v. Patel,* 762 F.2d 784, 794 (9th Cir.1985). The district court's denial of a motion for mistrial is also reviewed for an abuse of discretion. *United States v. Nelson,* 137 F.3d 1094, 1106 (9th Cir.1998).

A district court's actions during voir dire are ordinarily reviewed for an abuse of discretion. *United States v. Howell,* 231 F.3d 615, 627 (9th Cir.2000). But because Steele did not timely object to the district court's voir dire on grounds of racial prejudice, we review for plain error. *United States v. Klinger,* 128 F.3d 705, 710 (9th Cir.1997). Plain error is "highly prejudicial error affecting substantial rights and is found only in exceptional circumstances." *United States v. Varela,* 993 F.2d 686, 688 (9th Cir.1993). On a *Batson* challenge, whether Steele has made a prima facie showing of racial discrimination is reviewed for clear error. *Tolbert v. Page,* 182 F.3d 677, 685 (9th Cir.1999). Whether a prosecutor's proclaimed reason for exercising a peremptory challenge is an adequate race-neutral explanation is an issue of law to be reviewed de novo. *Id.* at 680 n. 5. A trial court's determination on discriminatory intent is a finding of fact entitled to deference and is reviewed for clear error. *Id.*

### A.

After the five day trial, the jury spent approximately three hours deliberating and then recessed for the day. The next day, the jury resumed deliberation. They then requested a read-back of trial testimony which lasted about two hours. Thereafter, the jury went to lunch, and returned and deliberated for approximately two and half more hours. At this point, the jury foreman sent the court a note stating: "We have not been able to reach a unanimous verdict. How do we proceed from this point forward?" Steele requested a mistrial, but the district court refused. Instead the court recalled the jury and suggested that they take the rest of the day off. Over Steele's objections, the judge also gave the following *Allen* charge:

As jurors you have the duty to discuss the case with one another and to deliberate in an effort to reach a unanimous verdict if each of you can do so without violating your individual judgment and conscious [sic]. Each of you must decide the case for yourself but only after you consider the evidence impartially with your fellow jurors. During your deliberations you should not hesitate to reexamine your own views and change your opinion if you are now persuaded that it is wrong. However, you should not change an honest belief as to the weight or effect of the evidence solely because the opinions of your fellow jurors or for the mere purpose of returning a verdict. All of you are equally honest and conscientious jurors who have heard the same evidence. All of you share an equal desire to arrive at a verdict. Each of you should ask yourself whether you should question the correctness of your present position. I remind you that in your deliberations you are to consider the instructions I have given you as a whole. You should not single out any part of any instruction, including this one, and ignore others. They are all equally important. Now, at this time, I'm going to ask you to take the rest of the day off, to return tomorrow at whatever time you would normally set or if you want to go back into the jury room to set that time as you are entitled to do and then continue your deliberations in the morning.

Later, the district court reiterated: "Then we'll see you in the morning and ask you

to continue deliberating." The jury came back the next day for seven hours of deliberations. After recessing for the weekend, the jury resumed deliberations on Monday and reached a verdict after an additional half hour of deliberation. The total period of deliberations was approximately 14 hours—seven and one-half hours being spent after the *Allen* charge was given.

Steele argues that the district court abused its discretion in giving the *Allen* charge because the instruction was both premature and coercive. Steele contends that the *Allen* charge was given prematurely because the jury had not indicated that it was deadlocked. Steele also argues that the *Allen* charge was coercive because: (1) the district court repeated the *Allen* charge, as rendered *supra*,—when it reiterated that the court was asking the jury "to continue deliberating"—without cautionary language, and (2) the jury came back with a verdict after only half an hour of deliberation (when they returned on Monday) suggesting that one or two jurors were undecided but gave up continuing to hold out despite conscientious doubts about the government's case.

 An *Allen* charge should be given only when it is apparent to the district court from the jury's conduct or length of deliberation that the charge is clearly warranted. *Sullivan v. United States*, 414 F.2d 714, 716 (9th Cir.1969). Here, the district court was given a specific indication by the foreman that the jury had reached an impasse. The circumstances were sufficient to show that the jury was deadlocked and the *Allen* charge was not premature. *Cf. United States v. Beattie*, 613 F.2d 762, 764 (9th Cir.1980) (noting that, where a jury had not stated that it was deadlocked, an *Allen* charge was likely premature). However, even were we to conclude that the *Allen* charge was prematurely given, the jury verdict could be

reversed only if the *Allen* charge was also coercive. *See Beattie*, 613 F.2d at 765.

 In determining whether an *Allen* charge is coercive, the court examines: (1) the form of the instruction, (2) the time the jury deliberated after receiving the charge in relation to the total time of deliberation and (3) any other indicia of coerciveness. *United States v. Daas*, 198 F.3d 1167, 1180 (9th Cir.1999). Here, the district court gave a neutral form of the *Allen* charge based upon the Ninth Circuit Model Criminal Jury Instruction 7.7. *See* Manual of Model Criminal Jury Instructions for the District Courts of the Ninth Circuit, Instruction No. 7.7 (2000). The repeated admonition to continue deliberations was part of the approved instructions and was not a new addition. That the jury deliberated longer after the *Allen* charge was given than before also indicates that there was no coercion. *Cf. Beattie*, 613 F.2d at 765–66 (finding that a jury's deliberation of three and a half hours after the *Allen* charge, as opposed to the 35 minutes of post-*Allen* deliberation in *United States v. Contreras*, 463 F.2d 773 (9th Cir.1972), indicated that the *Allen* charge was not coercive). Finally, there are no other indicia of coerciveness. The fact the jury reached its verdict half an hour after returning from a weekend recess could merely reflect that the jurors came to a resolution during a weekend when they individually pondered the evidence. The weekend interval itself probably would have diluted any coercive effect of an *Allen* charge given the prior Thursday. Thus, the district court did not abuse its discretion when it gave the *Allen* charge.

## B.

During voir dire, it was revealed that one of the prospective jurors, Tim Ahearn, was an attorney recently employed as a public defender. The prosecutor asked

Ahearn: "In the course of trying [felony robbery] cases, did you ever make a decision that your client was guilty and you've just got to do whatever you have got to do because that's your job?" Ahearn answered: "I guess so, yeah. You know, it gets—the facts might show one way or the other, and you have to pursue the case if the client wants to or not, it's their decision."

At this point, defense counsel objected, arguing that the questioning tainted the jury by creating the erroneous impression that defense attorneys in certain cases have to proceed to trial even though they believe that their clients are guilty. The prosecutor disputed this, but indicated that she would be happy to continue voir dire at side bar, unless defense counsel agreed to stipulate to excuse juror Ahearn for cause. Defense counsel agreed to the stipulation, but also moved for a mistrial. The district court denied the motion for mistrial. Defense counsel rejected an offer by the court to give a curative instruction to the remaining prospective jurors because he believed that such an instruction would only exacerbate the misconceptions already created.

On appeal, Steele argues that the district court abused its discretion in refusing to grant the motion for mistrial because: (1) the prosecutor engaged in misconduct when she created the misconception that defense counsel would defend clearly guilty defendants, and (2) the voir dire of Ahearn tainted the whole jury pool by communicating this misconception.

■ The fundamental purpose of voir dire is to "ferret out prejudices in the venire" and "to remove partial jurors." *United States v. Howell*, 231 F.3d 615, 627–28 (9th Cir.2000). Here, the prosecutor was entitled to question Ahearn on whether his work as a public defender would bias him against the prosecution.

The prosecutor's questions in the present case may not have been the best way to elicit signs of bias, but the circumstances do not support the conclusion that there was prosecutorial misconduct. First, the question did not improperly comment on Steele's defense counsel; the prosecutor's question did not have the effect, reasonably viewed, of comparing Ahearn's experience with the experience of Steele's counsel. Second, the questioning stopped immediately after defense counsel objected, and was never referred to by either party during voir dire or at trial. Finally, there is no indication that the prosecutor intentionally sought to create the impression that "*all* defense counsel in criminal cases are retained solely to lie and distort the facts and camouflage the truth in an abominable attempt to confuse the jury as to their client's involvement with the alleged crimes." *Bruno v. Rushen*, 721 F.2d 1193, 1194 (9th Cir.1983). Thus, the district court did not abuse its discretion in denying Steele's motion for a mistrial based upon the voir dire of Ahearn.

■ Further, the questioning did not taint the jury pool with the misconception that Steele's attorney was defending an obviously guilty client. First, Ahearn's answer cannot be reasonably viewed as expert-like testimony that all defense counsel were defending obviously guilty clients. Rather, the testimony was that Ahearn sometimes found himself in this predicament, not that all defense attorneys always, or habitually, had guilty clients. Ahearn never testified (and he could not have testified) that he was an experienced public defender with knowledge of the practice generally by public defenders of defending the obviously guilty. Second, the questioning stopped immediately after Ahearn answered and he was removed for cause. This lessened any potential prejudicial impact upon the remaining jurors.

Finally, any such impact could also have been obviated by a curative instruction, but defense counsel refused the district court's offer to give one. Thus, the district court did not abuse its discretion in denying the motion for a mistrial.

## C.

During voir dire, prospective juror Jackson, an African–American, mentioned: "I have strong opinions about police and the system and how it works." On further questioning, Jackson revealed that she believed that sometimes people were treated unfairly by the police because of their race. At this time, the prosecution asked the entire venire whether any one of them had unpleasant experiences with the police. The prosecution also asked the judge to conduct voir dire on the issue whether the jurors, in general, perceived that minorities are treated unfairly by the police. Defense counsel never objected to this request. The district court asked the question, and continued further voir dire at side bar with any juror who expressed a belief in unfair treatment of minorities by law enforcement. In response to the district court's question, prospective juror Baham indicated that she believed that minorities are discriminated against by the criminal justice system. However, she said that she could put aside these views during trial. The prosecutor was unsuccessful in removing juror Baham for cause. After the voir dire was completed, defense counsel objected to the line of questioning that had been followed (beginning with prospective juror Jackson). Later, the government used one of its peremptory challenges to remove Baham.

**[2]** On appeal, Steele argues that the district court abused its discretion in asking jurors whether they perceived that minorities were treated unfairly by the criminal justice system. However, this line of questioning was permissible because prospective juror Jackson raised this issue during voir dire. Although Jackson initially raised only a general concern about the justice system, upon questioning by the prosecutor to explain her concerns, Jackson stated that her doubt was about racial prejudice in the justice system. Thus, this case is similar to *Tolbert v. Gomez*, 190 F.3d 985 (9th Cir.1999). In *Tolbert*, one of the prospective jurors raised the issue of racial attitudes in society and the way minorities are treated by the system. *Id.* at 986–87. This circuit held that a prospective juror's expressed views on the importance of race in the evaluation of individual guilt were a proper basis for a peremptory challenge. *Id.* at 989 ("Challenging a prospective juror on the basis of his expressed opinions about the judicial system does not violate *Batson*."). Inquiry about whether prospective jurors hold views on racial prejudice in law enforcement similar to those raised by one of them is therefore entirely reasonable. Thus, it was not plainly erroneous for the district court to permit the government to inquire into whether the prospective jurors held such racially tinged opinions.

Steele also argues that the government did not satisfy its burden under *Batson* to demonstrate a race-neutral reason for removing prospective juror Baham. In *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the Supreme Court prescribed a three-step process for evaluating allegations that peremptory challenges were used in violation of the Equal Protection Clause. First, the defendant must establish a prima facie case of racial discrimination. *Batson*, 476 U.S. at 96–97, 106 S.Ct. 1712. Second, the prosecutor must offer a race-neutral explanation for the challenge. *Id.* at 97, 106 S.Ct. 1712. Finally, the trial court must decide whether the defendant has proved

purposeful racial discrimination. *Id.* at 98, 106 S.Ct. 1712. Here, the trial court rejected Steele's *Batson* challenge. It found that the defendant had not presented a prima facie case, but, in any event, the government had offered a race neutral reason. The district court also found that Steele could not prove intentional racial discrimination.

We need not examine whether Steele has made out a prima facie case because the government has offered a legitimate and credible race-neutral explanation for the peremptory challenge. The government asserts that it struck Baham because of her view that racial discrimination may taint the criminal justice system. This is a race-neutral reason because it is a view not based on the race of the prospective juror and it is not linked to any racial group. In fact, a white prospective juror held this same view—and was also struck from the jury on a peremptory challenge by the government. This Court, in fact, has held that "[c]hallenging a prospective juror on the basis of his expressed opinions about the judicial system does not violate *Batson*." *Tolbert,* 190 F.3d at 989. Finally, there is nothing in the record to cast substantial doubt on the trial court's finding that Steele had not shown purposeful racial discrimination by the government. Thus, the district court did not err in denying Steele's *Batson* challenge.

### III.

For the foregoing reasons, Steele's conviction is AFFIRMED.