**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
                        *Plaintiff-Appellee,*

v.

DAVID DWIGHT WILLIAMS,
                        *Defendant-Appellant.*

No. 06-50599

D.C. No.
CR-02-03171-IEG

UNITED STATES OF AMERICA,
                        *Plaintiff-Appellee,*

v.

WILLIAM A. STEEL,
                        *Defendant-Appellant.*

No. 06-50608

D.C. No.
CR-02-03171-IEG

UNITED STATES OF AMERICA,
                        *Plaintiff-Appellee,*

v.

TALFORD BROWN,
                        *Defendant-Appellant.*

No. 06-50612

D.C. No.
CR-02-03171-IEG

OPINION

Appeal from the United States District Court
for the Southern District of California
Irma E. Gonzalez, District Judge, Presiding

Argued and Submitted
April 8, 2008—Pasadena, California

Filed November 6, 2008

15167

Before: William C. Canby, Jr., Andrew J. Kleinfeld, and
Jay S. Bybee, Circuit Judges.

Opinion by Judge Bybee

**COUNSEL**

Benjamin L. Coleman, Coleman & Balogh LLP, San Diego, California, for appellant David Williams.

Michael Edmund Burke, San Diego, California, for appellant William Steel.

Brian J. White, San Diego, California, for appellant Talford Brown.

Stephen Frederick Miller, Assistant United States Attorney, San Diego, California, for appellee United States.

---

**OPINION**

BYBEE, Circuit Judge:

David Williams, William Steel, and Talford Brown appeal their convictions following a jury trial for conspiracy to interfere with interstate commerce by robbery, conspiracy to possess cocaine with the intent to distribute, and possession of a firearm during a drug crime and crime of violence. Williams, Steel, and Brown argue, *inter alia*, that there was insufficient evidence to support their convictions, that their indictment should have been dismissed because of outrageous government conduct, and that the district court should have declared a mistrial because a juror revealed that she was the lone holdout. We hold that there was sufficient evidence to support the convictions and that the government did not deny the defendants their due process rights by engaging in outrageous conduct. Because the district court gave an *Allen* charge after a juror disclosed that she was a holdout, we reverse and remand for a new trial.

I

David Williams, Talford Brown, William Steel, and Evan Hollingsworth[1] were indicted in the Southern District of California for one count of conspiracy to interfere with commerce by robbery, *see* 18 U.S.C. § 1951(a); one count of conspiracy

---

[1] Hollingsworth pleaded guilty to a single count of carrying a firearm during a drug crime and crime of violence, in exchange for his testimony at trial and for dismissal of the remaining two counts.

to possess cocaine with the intent to distribute, *see* 21 U.S.C. §§ 841(a)(1), 846; and one count of carrying a firearm during a drug crime and crime of violence, *see* 18 U.S.C. § 924(c)(1)(A), (c)(2).

The following account is taken from the evidence introduced at trial. Around August 2002, a man identified only as "Marty" introduced Williams as a drug dealer to a paid government informant named Tony.[2] During that month, Tony and Williams planned a marijuana sale in New Orleans. Tony was to provide the marijuana, and Williams was to put Tony in contact with a buyer. The deal did not go through, but Williams and Tony continued to negotiate planned drug transactions, including one involving cocaine from Belize and one involving a ten to fifty kilogram cocaine purchase by Williams. At some point during their association, Williams confessed to Tony that he had pleaded no contest to and was wanted for a bank robbery in Texas.

A few days before October 25, 2002, Williams told Tony about a bank robbery he had planned, and that he needed to sell a firearm to raise money to rent the getaway car. Williams already had planned the bank robbery in some detail, having identified the target bank and recruited someone on the inside of the bank to help. Williams tried to enlist Tony to be the getaway driver. Tony relayed this information to Floyd Mohler, an agent with the Bureau of Alcohol, Tobacco and Firearms ("ATF"), who proposed that Tony pitch the idea of robbing a fictitious drug stash house in lieu of robbing the bank.

---

[2]At trial, Williams denied knowing anything about how to deal drugs and contended that he had been introduced to Tony in June 2002 because Williams needed money and Tony could provide him a loan. Many of the conversations between Williams and Tony were taped, though conversations describing the drug deals other than the Jamaican marijuana deal, described *infra*, were destroyed prior to trial.

On October 25, 2002, Tony met Williams and Andy Jauch, an undercover Drug Enforcement Administration ("DEA") agent, at a restaurant and recorded the conversation. During that meeting, Williams sold a handgun to Tony. Tony told Williams that the gun was for a man named Enrique, who was involved in a drug smuggling operation in San Diego and who was interested in robbing a drug stash house. Williams informed Tony and Jauch about some Jamaicans in New York City who wanted to buy a significant quantity (between one thousand and two thousand pounds) of marijuana. Williams also supplied many details about his planned bank robbery.

On October 29, 2002, Williams and Tony met with a man named Wayne, who was affiliated with the Jamaicans in New York seeking to buy the marijuana. Williams flew to New York to meet Wayne on November 1, 2002, and had several recorded telephone conversations with Tony and Wayne. These conversations concerned only the New York City marijuana transaction. Tony met with the Jamaicans later in November 2002; the Jamaicans were arrested when they arrived with the money to buy the marijuana.

On November 4, Tony introduced Williams to ATF agent Harry Penate, who was playing the undercover role of Enrique Romano. Penate told Williams that he had a job for Williams, but that Williams could decline it if he wanted. Penate told Williams that he operated drug stash houses for a drug smuggling organization, but some of the drug loads recently had been lost. To compensate for the lost loads, the drug organization was not paying Penate. Penate said that in a few days, the stash house would contain one hundred kilograms of cocaine and between fifty and sixty thousand dollars in currency, guarded only by the two women who count the money and a single guard with a sawed off shotgun. Penate told Williams that he wanted to hire someone with a crew to rob the money and the cocaine. He told Williams that if this robbery went well, there were two other stash houses that could be robbed.

As the conversation progressed, Penate and Williams discussed more details about how to conduct the robbery, including how to remove the drugs, how many people were in each house and how many were armed, and whether they would need to kill anyone. Williams indicated that he had two people with whom he could do the job, that he had worked with them before, and that he and his crew were ready to do the job immediately. They discussed how they would split the money and the drugs and how Williams would pay his crew. Williams indicated that one of the people he planned to use had recently been involved in a home invasion robbery like the one Penate had proposed, but had been caught.

On November 5, Williams and Tyrone Sprewell met with Penate and sold him another gun. Sprewell was introduced to Penate as someone who would be helping with the robbery, who had done similar things in the past, and who had done jobs with Williams before. Sprewell was later arrested on an outstanding warrant when he was pulled over during a traffic stop.

On November 8, Williams met Penate at a restaurant and discussed the plan details. He indicated that he intended to kill the armed guard at the stash house. He told Penate that Sprewell did not want to participate in the robbery, but that he had two other guys for the job. Williams said of his crew that "[t]hey know everything," including how the money and drugs would be divided. He said they had done jobs like this before and that they were pros.

On November 13, Williams met Penate at another restaurant near a motel in San Diego ("San Diego motel") and discussed the final details of the stash house robbery planned for the next day. Williams told Penate that the other members of the crew were following him and that they had brought some things so they could "handle" themselves. Penate told Williams that he had rented a room at another motel ("Chula Vista motel") five blocks from the stash house in Chula Vista,

which they would use to stage the robbery. He also told Williams that there would be over one hundred kilograms of cocaine and about $100,000 in cash in the house at the time of the robbery. Penate rented a minivan for Williams to drive. Williams said that he had three people involved, two who knew the plan and one who was just driving the guns and police radio down.[3] After this meeting, they retired to the room Penate had rented at the San Diego motel, which had been wired for audio and video recording.

On the morning of November 14, 2002, Penate met Williams at a room in the San Diego motel. Williams had been joined by Hollingsworth, Steel, and Brown. Prior to Penate's arrival, Williams called Penate and asked him to bring some breakfast items, as well as potatoes to be used as silencers, which Penate did.

Penate described to the four men the details of the plan at this meeting, including how they would enter the house. He told them if they did not want to participate, they should say so and "be on your way." Brown audibly indicated his willingness to participate, and Penate testified that Williams, Steel, and Hollingsworth nodded their assent.[4] Williams, Steel, Brown, and Hollingsworth then wiped the room free of fingerprints. While they prepared to leave, Williams asked Brown, "How many you got?" Brown replied, in an apparent reference to the number of bullets in his gun, "I will got nine, but I only need one."

Penate, the three appellants, and Hollingsworth then left the San Diego motel to drive to the second motel in Chula Vista.

---

[3]Hollingsworth, who pleaded guilty to a reduced set of charges, was the third man who drove the guns down but did not know the plan.

[4]Portions of audiotape 9A, discussed in more depth *infra*, recorded one side of Penate's conversation with the other agents after he left the first motel. In a disputed portion of that tape, Penate referred to "one of those two other dudes who didn't nod."

Penate drove a blue Ford Explorer; Williams followed in the rented minivan, then Hollingsworth in a Jaguar sedan. Steel completed the caravan with Brown as a passenger in a Dodge Intrepid. All four vehicles pulled into the Chula Vista hotel; only Williams followed Penate into the rear parking area where the SWAT team deployed a flash-bang grenade before arresting Williams. Steel and Brown, in the Dodge Intrepid, left the Chula Vista hotel shortly after arriving. The Chula Vista police stopped them as they drove away. The officers ordered Steel and Brown out of the car and arrested them; a search of Brown upon his arrest revealed a gun holster on his waist.

A search of the Intrepid recovered a knife, a blue and red mask, a gray mask, a piece of paper with handwritten directions to the San Diego motel, flex ties, a road guard vest, two cell phones, a black leather wallet with an identification card belonging to Brown, and three whole potatoes. A later search recovered two loaded semiautomatic pistols in a compartment in the center gear box console. One of the weapons was loaded with six hollow-point copper jacketed bullets; the other contained seven rounds of hollow-point, hydroshock, copper jacketed bullets. A search of the Jaguar, which was also stopped at the Chula Vista motel, recovered a revolver loaded with hollow point hydraulic bullets, a police scanner, and three mobile radios from a speaker box. A search of the minivan recovered a nylon mask, a pair of Nomex gloves, and a small flashlight.

On November 7, 2003, a jury returned verdicts of guilty on each of the three counts for each of the three appellants. The district court denied various pre-trial and post-trial motions that are the subject of this appeal, including a motion for mistrial resulting from a note sent by a juror; a pre-trial motion to dismiss the indictment for outrageous government misconduct and entrapment, and a post-trial motion to dismiss for outrageous government misconduct and to enter a judgment of acquittal under Federal Rule of Criminal Procedure 29. The

district court sentenced Williams to 37 months of imprisonment on count 1, a concurrent term of 188 months of imprisonment on count 2, and a consecutive term of 60 months imprisonment on count 3, to be followed by a period of 5 years of supervised release. The district court sentenced Brown to a term of 71 months of imprisonment on count 1, a concurrent term of 27 months imprisonment on count 2, and a consecutive term of 60 months of imprisonment on count three, to be followed by a period of 5 years of supervised release. The district court sentenced Steel to 87 months of imprisonment on count 1, a concurrent term of 33 months of imprisonment on count 2, and a consecutive term of 60 months of imprisonment on count 3, to be followed by a period of 6 years of supervised release.

Williams, Brown, and Steel timely appealed.

## II

Williams, Brown, and Steel present several claims for our review, some of which all three defendants join and some of which are presented individually. We first address the claims that, if successful, would result in either a judgment of acquittal or dismissal of the indictment. We then proceed to discuss the claim that the district court erred in giving an improper *Allen* charge after a juror disclosed that she was a holdout.[5]

## A

Williams, Brown, and Steel first argue that the district court erred in refusing to enter a judgment of acquittal under Fed-

---

[5]Because we conclude that the district court committed reversible error by giving an improper *Allen* charge, we need not reach the claims that the district court erred in failing to give a limiting instruction on Hollingsworth's guilty plea, in failing to instruct the jury properly on the elements of the crime underlying the conspiracy charges, or in improperly admitting co-conspirator statements under Federal Rule of Evidence 801(d)(2)(E).

eral Rule of Criminal Procedure 29 for insufficiency of the evidence on various aspects of the charges against them.[6]

1

Steel and Brown first argue that there was insufficient evidence to convict them of the conspiracy in counts one and two of the indictment.[7] They base their argument on inconsistent testimony Penate gave concerning whether Steel or Brown orally assented to the plan to rob the fictitious stash house.

**[1]** Penate initially testified at trial that during the November 14 meeting at the San Diego motel, he verbally confirmed with each individual (Williams, Hollingsworth, Steel, and Brown) that they were "in"—that is, that they agreed to participate in the plan to rob the stash house. On cross-examination, however, he said that Steel gave an oral response, but later testified, "I don't believe Steel was verbal during that whole time," and that Steel just nodded. Some evi-

---

[6]We review *de novo* a motion for a judgment of acquittal under Federal Rule of Criminal Procedure 29, viewing the evidence against the appellants in the light most favorable to the government to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *United States v. Pacheco-Medina*, 212 F.3d 1162, 1163 (9th Cir. 2000).

[7]Williams joins this claim, arguing that if there was insufficient evidence to convict his co-defendants of conspiracy, then he could not have been convicted of conspiring with a government agent. It is well-established law that "the agreement in a conspiracy cannot be established with evidence that the defendant had an agreement with a government informer." *United States v. Ching Tang Lo*, 447 F.3d 1212, 1225-26 (9th Cir. 2006) (citing *United States v. Escobar de Bright*, 742 F.2d 1196, 1198-200 (9th Cir. 1984)). As to Williams,"[t]he question, therefore, is whether there was sufficient evidence to find a conspiracy with someone other than government agents and informants." *Id.* at 1226. Hollingsworth pleaded guilty and testified for the government at trial. Hollingsworth's testimony therefore provides sufficient evidence for Williams' conspiracy conviction; Williams' contention to the contrary lacks merit. Regardless, for the reasons that follow, we hold there was sufficient evidence to support Steel and Brown's convictions.

dence suggested that Steel may not have even nodded. Penate's testimony concerning Brown was similarly inconsistent. At a pretrial motion hearing, Penate admitted it was possible only Williams agreed orally, but, at trial, he testified only Brown orally assented. Steel and Brown also argue that their actions after they left the San Diego motel indicate that they did not agree to the conspiracy because they did not follow the caravan to the Chula Vista motel, where they were supposed to go, but were pulled over entering the freeway. Steel and Brown's argument incorrectly assumes that the only evidence that could support a conspiracy conviction is evidence of their affirmative agreement to join it. "[A] conspiracy may be proven by circumstantial evidence that the defendants acted together with a common goal." *United States v. Iriarte-Ortega*, 113 F.3d 1022, 1024 (9th Cir. 1997), *amended by United States v. Iriarte-Ortega*, 127 F.3d 1200 (9th Cir. 1997). With that standard in mind, there was ample evidence to convict Steel and Brown of both conspiracy to commit robbery and conspiracy to possess cocaine with the intent to distribute.

[2] Evidence supporting the conspiracy to commit robbery charge included that Steel and Brown met with Williams, the government agents, and Hollingsworth at the San Diego motel on November 14 and participated in wiping down fingerprints in the room. They brought guns with hollow point bullets to the meeting, and Brown told Williams that, though his gun had nine rounds of ammunition, "I only need one." Brown and Steel rode in the car together from the San Diego motel to the Chula Vista motel, with Brown wearing a holster that fit one of the guns later recovered from his car. The search of their car also revealed flex-ties, workers' vests, masks, gloves, a knife, and potatoes to be used as gun silencers. Brown and Steel claim that they did not drive to the back of the Chula Vista motel parking lot, but trial testimony was sufficient for the jury to conclude that they initially drove to the Chula Vista motel and fled when they saw the police.

In addition to this evidence, other evidence supported the charge of conspiracy to possess cocaine with the intent to distribute. Williams told Penate on November 13 that "the only people that know the plan are the two guys," an apparent reference to Steel and Brown. Referring to the people who Williams had recruited to help him with the robbery, Williams said, "They know that they're going in, they're getting paid to do a job. . . . They know everything." Williams said to Penate, "I told [his crew] I was gonna a [sic] touch 'em back some later, once I got all the money from Tony. Later on down the line I said I'm gonna give ya'll some of the money on that [the drugs]."

**[3]** Although some of the trial evidence supported an inference of not guilty—such as Penate's inconsistent testimony concerning who verbally assented to participate in the plan and the fact that Brown and Steel were not apprehended at the predesignated meeting location —when viewed in the light most favorable to the government, there was ample evidence for a rational jury to conclude beyond a reasonable doubt that the appellants "acted together with a common goal." *Iriarte-Ortega*, 113 F.3d at 1024.

2

**[4]** Steel and Brown next argue that there was insufficient evidence of an effect on interstate commerce or that there was actually any cocaine at the fictitious stash house. The crux of these two arguments is that a conspiracy to rob a non-existent stash house cannot interfere with interstate commerce. We squarely rejected this argument in *United States v. Rodriguez*, 360 F.3d 949, 957 (9th Cir. 2004) ("[T]he non-existent status of the target drug traffickers is inapposite. Impossibility is not a defense to the conspiracy charge."), and we summarily reject it here.

3

**[5]** Steel and Brown next argue that there was insufficient evidence of an intent to distribute the cocaine that was the

subject of the conspiracy to possess. This argument lacks merit. The evidence produced at trial was sufficient for a jury to conclude that Penate told Williams on November 13, 2002, that there would be one hundred kilograms of cocaine in the stash house at the time of the planned robbery, and expert testimony established that this was a sufficiently large amount that it would be intended for distribution. Williams was also recorded telling Tony that Williams' crew knew everything about the plan, including how the drugs and money would be divided. During a November 8 conversation between Penate and Williams, Williams said, "I already know that they [Steel and Brown] [a]re gonna see the [cocaine] so I told them I was gonna a [sic] touch 'em back some later, once I got all the money from Tony. Later on down the line I said I'm gonna give ya'll some of the money on that, and they were like it's cool. I said the cash, we're gonna split it up, ya'll too gonna get a third." Viewed in the light most favorable to the government, this evidence was sufficient to permit a rational jury to find that Steel and Brown intended to distribute the cocaine after they obtained it.

4

Finally, Williams argues that there was insufficient evidence to convict him of conspiracy to possess cocaine with the intent to distribute because he demonstrated entrapment as a matter of law.[8]

[6] "To establish entrapment as a matter of law, the defendant must point to undisputed evidence making it patently clear that an otherwise innocent person was induced to com-

---

[8]We review *de novo* claims of entrapment as a matter of law. *United States v. Sandoval-Mendoza*, 472 F.3d 645, 648 (9th Cir. 2006). A verdict should be affirmed when the jury has been instructed on the elements of entrapment, as it was here, "unless, viewing the evidence in the government's favor, no reasonable jury could have concluded that the government disproved the elements of the entrapment defense." *Id.* (quoting *United States v. Mendoza-Prado*, 314 F.3d 1099, 1102 (9th Cir. 2002)).

mit the illegal act by trickery, persuasion, or fraud of a government agent." *United States v. Smith*, 802 F.2d 1119, 1124 (9th Cir. 1986). This is a subjective inquiry into whether "the Government's deception actually implants the criminal design in the mind of the defendant." *United States v. Russell*, 411 U.S. 423, 436 (1973). "Inducement can be any government conduct creating a substantial risk that an otherwise law-abiding citizen would commit an offense, including persuasion, fraudulent representations, threats, coercive tactics, harassment, promises of reward, or pleas based on need, sympathy or friendship." *United States v. Davis*, 36 F.3d 1424, 1430 (9th Cir. 1994).

**[7]** The defense of entrapment fails "[i]f the defendant is predisposed to commit the crime." *Smith*, 802 F.2d at 1124. We use five factors to determine whether a defendant was predisposed, though no single factor is controlling. *See United States v. Busby*, 780 F.2d 804, 807 (9th Cir. 1986). These factors include:

> (1) the character or reputation of the defendant, including any prior criminal record; (2) whether the government initially made the suggestion of criminal activity; (3) whether the defendant engaged in the criminal activity for profit; (4) whether the defendant evidenced reluctance to commit the offense that was overcome by repeated government inducement or persuasion; and (5) the nature of the inducement or persuasion supplied by the government.

*Smith*, 802 F.2d at 1124-25. "[T]he defendant's reluctance to engage in criminal activity is the most important." *Id.* at 1125.

**[8]** Williams argues that he was induced as a matter of law because the government offered him hundreds of thousands to perhaps more than a million dollars in potential cocaine sales. But even assuming that Williams was induced to enter the conspiracy by the lure of substantial financial gain, the gov-

ernment proved that he was predisposed to commit the crime. Williams correctly points out that the question of predisposition is to be determined prior to the time the government agent suggested the criminal activity. *See United States v. Poehlman*, 217 F.3d 692, 703 (9th Cir. 2000). Even with that limitation, ample evidence on each of the five *Smith* factors supported a jury finding that Williams was predisposed to commit the crime. First, Williams was a fugitive from justice for a bank robbery in Texas, he had engaged in previous criminal gun sales, and he had been introduced to Tony as a middleman drug dealer. There was strong evidence of the latter, as Williams planned a drug deal involving about $700,000 in marijuana. The first factor relevant to the determination of his predisposition, his character and reputation including his prior criminal record, suggests that he was predisposed to this type of criminal activity. *See Smith*, 802 F.2d at 1124-25.

The second factor also supports the conclusion that Williams was predisposed to commit the robbery. Although the government initially suggested the stash house robbery, it did so only after Williams told the agents of his plans to commit bank robbery, which he concocted entirely on his own. While the criminal schemes are not identical, they both involve stealing property with force as well as the use of firearms. *See id.*

The third *Smith* factor counts squarely against Williams. It is undisputed that Williams engaged in the conspiracy for a profit, which weighs against an entrapment defense. *See id.*

**[9]** The fourth and most important *Smith* factor does not support Williams' argument, either. There is no evidence that Williams expressed any reluctance about the robbery that needed to be "overcome by repeated government inducement or persuasion." *Id.* at 1125. The evidence indicated that Williams was ready and willing at all times to participate in the robbery. Penate told Williams on more than one occasion that he could decline the job, but Williams responded: "I'm ready

to do it tomorrow! Like I said, all I gotta do is get the car. If push comes to shove I'll use my own car." When Penate told Williams that he needed an answer by the next day, Williams stated, "You got your answer right now!" Williams needed no persuasion from the government agent to enter into this conspiracy, which counts heavily against his entrapment argument.

The fifth *Smith* factor, the nature of the inducement provided by the government, also provides no support for Williams. The stash house robbery was suggested as an alternative to a bank robbery, which Williams thought would net a similar amount of money.

**[10]** Viewing the evidence as a whole in the government's favor, a reasonable jury could find that Williams was predisposed to commit the crime and therefore the government disproved the elements of entrapment.

* * * *

**[11]** Accordingly, we affirm the district court's decision to deny the appellants' Rule 29 motions.

B

Williams, Brown, and Steel next argue that the district court erred in failing to dismiss the indictment due to outrageous government conduct.[9] They claim the government concocted, directed, and supervised the criminal enterprise from start to finish, and thus falls within the prohibition on outrageous government conduct imposed by the Due Process Clause of the Fifth Amendment. *See United States v. Russell*,

---

[9]We review *de novo* claims of outrageous government conduct, viewing the evidence in the light most favorable to the government and reviewing the district court's factual findings for clear error. *United States v. Gurolla*, 333 F.3d 944, 950 (9th Cir. 2003).

411 U.S. 423, 431-32 (1973). For the reasons described below, we reject their argument.[10]

**[12]** " 'Outrageous government conduct is not a defense, but rather a claim that government conduct in securing an indictment was so shocking to due process values that the indictment must be dismissed.' " *United States v. Holler*, 411 F.3d 1061, 1065 (9th Cir. 2005) (quoting *United States v. Montoya*, 45 F.3d 1286, 1300 (9th Cir. 1995)). This claim requires meeting a "high standard," *id.* at 1066, with a showing that "the government's conduct violates fundamental fairness and is 'shocking to the universal sense of justice mandated by the Due Process Clause of the Fifth Amendment.' " *United States v. Gurolla*, 333 F.3d 944, 950 (9th Cir. 2003) (quoting *Russell*, 411 U.S. at 431-32). We explained in *Gurolla* that "[t]his standard is met when the government engineers and directs a criminal enterprise from start to finish," but "is not met when the government merely infiltrates an existing organization, approaches persons it believes to be already engaged in or planning to participate in the conspiracy, or provides valuable and necessary items to the venture." *Id.* (internal quotation marks and citations omitted).

**[13]** In *United States v. Bonanno*, 852 F.2d 434 (9th Cir. 1988), we set forth five factors that, when satisfied, indicate that the governmental conduct was acceptable. The five factors are:

> (1) the defendant was already involved in a continuing series of similar crimes, or the charged criminal enterprise was already in process at the time the gov-

---

[10]We assume without deciding that Brown and Steel have standing to raise this claim, although there is substantial merit to the government's argument that only Williams has standing to bring this claim. *See United States v. Bogart*, 783 F.2d 1428, 1433 (9th Cir. 1986) (finding that only defendants to whom the government's conduct is directed have standing to raise an outrageous government conduct claim).

ernment agent became involved; (2) the agent's participation was not necessary to enable the defendants to continue the criminal activity; (3) the agent used artifice and stratagem to ferret out criminal activity; (4) the agent infiltrated a criminal organization; and (5) the agent approached persons already contemplating or engaged in criminal activity.

*Id.* at 437-38.

**[14]** These five factors are all satisfied in this case. First, the district court found that Williams was already involved in a continuing series of similar crimes. He had been introduced to Tony by a third party nearly three months before the stash house robbery was suggested. Williams was introduced to Tony as a middleman drug dealer, and Williams planned major drug deals with Tony from August until October 2002, including one involving up to two thousand pounds of marijuana. Williams initiated several of these drug transactions on his own. During this time period, Williams told Tony that he was wanted for a Texas bank robbery to which he pleaded no contest. Before the stash house robbery was suggested to Williams, he told Tony about a thoroughly planned bank robbery he intended to complete with his experienced crew. Williams indicated that he needed to sell a handgun to raise money to rent the getaway car for the bank robbery and asked Tony to be the getaway driver. The next day, Williams actually sold the gun. As this evidence shows, Williams was involved in both robberies and drug transactions before Tony suggested the idea of the stash house robbery.

Williams counters that the district court erred in looking to criminal activity committed by Williams after he met the confidential informant. This argument is unpersuasive. Competent evidence showed that Williams was introduced to Tony as a drug dealer and that Williams readily engaged in plans to buy and sell drugs with little or no encouragement from the government informants or agents. The evidence also showed

that Williams concocted the bank robbery scheme entirely on his own, without any help from Tony. The first *Bonanno* factor is satisfied.

**[15]** The second *Bonanno* factor is also satisfied. Tony's participation was not necessary to enable Williams to carry out the bank robbery or many of the planned drug deals. Williams already had detailed plans to conduct the robbery, and he personally negotiated with the Jamaicans in New York for a very large marijuana transaction.

The last three *Bonanno* factors are similarly met. Williams indicated that he had an experienced crew and that they were ready to help with the bank robbery he had independently planned—the agents thus "infiltrated a criminal organization." *Id.* at 438. Although the government agents suggested the stash house robbery to prevent Williams from conducting the bank robbery, this is best characterized as a "stratagem to ferret out criminal activity," not outrageous government conduct. Williams was clearly "already contemplating or engaged in criminal activity." *Id.*

**[16]** The appellants argue that just because Williams had planned a bank robbery and had been involved in some planned drug deals did not mean that he was engaged in a crime similar to the one proposed by the government agents, which combined robbery with drug dealing. This argument is unpersuasive because the stash house robbery is sufficiently similar to the planned bank robbery that the government's substitution of a real bank robbery with a fictitious stash house robbery does not "violate[ ] fundamental fairness [or] 'shock[ ] the universal sense of justice mandated by the Due Process Clause of the Fifth Amendment.' " *Gurolla*, 333 F.3d at 950 (quoting *Russell*, 411 U.S. at 431-32). Both crimes required significant advance planning, the use of force to deprive persons of property, and the use of firearms, and both crimes required the participants' willingness to threaten or take human life. A stash house robbery differs from a bank

robbery only in the type of property to be stolen and the likeli-hood that the innocent public will be injured during the crime. The government's decision to use a sting operation to appre-hend this group of criminals reduced the risk of violence to the public and is to be commended, not condemned. Though perhaps creative, the government's sting does not violate the universal sense of justice.[11]

---

[11]In connection with the outrageous government conduct claim, the appellants present two additional arguments. First, they argue that the gov-ernment created a crime of violence, in violation of Justice Powell's con-currence in *Hampton v. United States*, 425 U.S. 484 (1976). Justice Powell stated: "There is certainly a constitutional limit to allowing governmental involvement in crime. It would be unthinkable, for example, to permit government agents to instigate robberies and beatings merely to gather evidence to convict other members of a gang of hoodlums." *Hampton*, 425 U.S. at 493 n.4 (Powell, J., concurring in the judgment) (quoting *United States v. Archer*, 486 F.2d 670, 676-77 (2d Cir. 1973)). The government correctly notes that Justice Powell was referring "to government conduct that would encourage and condone direct and deliberate harm to others," such as if the government prosecuted a defendant for robbery after encour-aging the defendant to rob a victim. Justice Powell's concurrence explic-itly approves the use of sting operations to combat drug offenses. *See Hampton*, 425 U.S. at 493 (Powell, J., concurring). Here, the sting opera-tion not only involved drugs, it was also designed to catch Williams, a known bank robber and drug dealer, in a *conspiracy* to perform the types of acts that he already indicated his willingness to perform and had begun planning. The government did not instigate a robbery or beating "merely to gather evidence to convict other members of a gang of hoodlums." *Id.* at 493 n.4. They devised a plan to catch a potentially dangerous group of robbers in a controlled sting operation.

Second, the appellants argue that the government directed the criminal scheme from start to finish. This argument lacks merit because Williams was intimately involved in the development of the plan. Williams hatched the bank robbery scheme entirely on his own, and he participated in the planning stages of the stash house robbery. He arranged for his crew to help him, including instructing Hollingsworth to bring a gun and a police scanner to the motel. He sold weapons to raise money to rent the car for the robbery, and he repeatedly indicated his willingness to do the job. Government agents may have "provide[d] valuable and necessary items to the venture," *Gurolla*, 333 F.3d at 950, but that is insufficient to demon-strate that the government directed the enterprise from start to finish. *Id.*

C

Brown, Williams, and Steel next argue that the indictment should be dismissed because the prosecution failed to disclose a portion of audiotape 9A until the very late stages of the trial. Tape 9A recorded Penate's side of a conversation with other agents as he left the San Diego motel to drive to the Chula Vista motel on November 14. During the prosecution's closing rebuttal argument, the government played a portion of tape 9A. At one point during the segment played, Penate apparently refers to "one of those other two dudes that didn't nod." The appellants' attorneys immediately objected that they had not received a copy of that portion of the tape prior to trial, that it was exculpatory material that should have been disclosed under *Brady v. Maryland*, 373 U.S. 83 (1963), and that the government should be sanctioned with a dismissal of the indictment.

The district court agreed that the recorded conversation was exculpatory and material to the defense because it called into question whether all of the defendants agreed to participate in the stash house robbery. Rather than dismiss the indictment, however, the district court permitted the defense to reopen its case to question Penate about the recording. Despite this remedial measure, the appellants argue that the indictment should be dismissed because the prosecution failed to disclose it at a time when it was useful at trial.[12]

**[17]** The three elements of a *Brady* violation are: (1) "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching"; (2) "that evidence must have been suppressed by the State, either willfully or inadvertently"; and (3) "prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999).

---

[12]We review *de novo* claims of *Brady* violations. *United States v. Danielson*, 325 F.3d 1054, 1074 (9th Cir. 2003).

**[18]** There was some question at trial whether the recording on tape 9A referred to two defendants who "didn't nod" or who "did the nod." The district court, after listening "to it over and over," stated that "it could go either way." The evidence was ambiguous and supported either interpretation, and it could have been used to impeach Penate, one of the government's most important witnesses. It therefore satisfies the first element of a *Brady* violation because it was exculpatory. There is no dispute that it also satisfies the second element because the defense did not receive it until very late in the trial.

**[19]** We need not address the third *Brady* element of prejudice, because a new trial is usually the appropriate remedy for a *Brady* violation, *see United States v. Chapman*, 524 F.3d 1073, 1086 (9th Cir. 2008), and we are granting the appellants a new trial on other grounds. Moreover, a *Brady* violation justifies or requires dismissal of the indictment only in cases rising "to the level of flagrant prosecutorial misconduct." *Id.* We have no difficulty concluding on this record that no such flagrant misconduct occurred. The taped segment was ambiguous, and the district court found there was no bad faith in failing to deliver the tape to the defense in a timely manner. The record supports that determination. Dismissal of the indictment therefore is not warranted.[13]

---

[13]Related to the *Brady* argument, the appellants argue that the government violated their due process rights by presenting Penate's perjured testimony and that the indictment should therefore be dismissed. We review this claim for plain error because the appellants did not object to the presentation of Penate's testimony at trial. *United States v. Geston*, 299 F.3d 1130, 1134 (9th Cir. 2002). Although there were inconsistencies in Penate's testimony, there was no evidence that the government knowingly presented false testimony. *See id.* at 1135 ("It is a prosecutor's duty to 'refrain from knowingly presenting perjured testimony and from knowingly failing to disclose that the testimony used to convict defendant was false.' " (quoting *United States v. Aichele*, 941 F.2d 761, 766 (9th Cir. 1991))). The inconsistencies in Penate's testimony were argued to the jury as the finder of fact. We reject the appellants' argument that the indictment should be dismissed on this basis.

D

Finally, Williams, Brown, and Steel challenge the district court's decision to give a supplemental jury instruction in response to a juror's note.[14] They argue that the district court was required to declare a mistrial because the juror's note revealed that she was a holdout. We agree.

The jury began deliberating at 9:10 a.m. on November 7, 2003. At about 11:45 a.m. on that same day, the district court received a note from the foreperson. The note stated, in relevant part: "[C]an a juror send you a note through me without my seeing it?" About thirty minutes after receiving that note, the foreperson sent another note saying, "Your Honor, the juror *refuses* to proceed until you have responded to her note." The district court consulted with the parties and then sent a note to the jury saying that any juror could send a note to the court. The district court then received a note from Juror No. 1. The note said (all spelling as in original):

> Judge Gonzales, I disagree with my fellow jurers of (a) entrapment, (b) conspiracy of possession to distribution of drugs, concerning David Williams, Steele, & Brown. I can't get pass this issue, & feel the other jurers have already convicted the three defendants on all accounts. As it stands, my headache is worst and will not be bombarded to change my opinion. May I please be excused from this case, as I feel very strong about my decision & could not face the defendants with the charges the other jurers are hard on declaring.

---

[14]We review for an abuse of discretion the district court's decision to issue a supplemental instruction, but we review *de novo* claims that a district court coerced a jury's verdict. *United States v. Berger*, 473 F.3d 1080, 1089 (9th Cir. 2007). In conducting this review, we view the supplemental instruction as a whole. *Lowenfield v. Phelps*, 484 U.S. 231, 237 (1988).

/s/ [name omitted] Jurer # 1.

P.S. I hate to use the word prejudice, but feel its presence strong in the room above the law.

The appellants moved for a mistrial, but the district court instead opted to reread to the jury one of the original jury instructions, supplementing it with an additional admonition to treat each juror with respect. The supplemental instruction said:

I want all of you to discuss the case with your fellow jurors to reach an agreement if you can do so. Your verdict, whether guilty or not guilty, must be unanimous. Each of you must decide the case for yourself, but you should do so after you have considered all the evidence, discussed it fully with the other jurors, and listened to the views of your fellow jurors.

Do not be afraid to change your opinion if the discussion persuades you that you should, but do not come to a decision simply because the other jurors think it is right.

It is important that you attempt to reach a unanimous verdict but only if each of you can do so after having made your own conscientious decision.

Do not change an honest belief about the weight and effect of the evidence simply to reach a verdict.

I want all of you to treat each other respectfully. I want all of you to listen to the views of your fellow jurors. And I want you to consider all of the instructions that I've given to you in addition to this one.

I've singled this one out right now because I wanted to remind you of it, but all the jury instructions are

equally important. And so I want you to go back in that jury room. I want you to treat each other with respect. I want each of you to talk about your views about the evidence in the case, and then we'll see what happens from there. So you are all excused to go back into the jury room.

The jury retired to deliberate again, and returned verdicts of guilty at about 5:00 p.m. on the same day.

Citing *United States v. Sae-Chua*, 725 F.2d 530 (9th Cir. 1984), the appellants argue that a mistrial was required because this instruction, given after the district court became aware that there was a holdout juror, was an improperly coercive *Allen* charge. The government responds that the supplemental instruction was not an *Allen* charge and that it was not coercive.

1

The first issue that must be resolved is whether this supplemental instruction warrants use of the *Allen* charge framework. The district court clearly did not intend to give an *Allen* charge; indeed, the court specifically stated that it was *not* going to give an *Allen* charge because the jury foreperson had not sent a note indicating deadlock. However, the determination of whether an *Allen* charge has been given does not depend on whether the parties or the district court thought the court was giving such a charge. Instead, it depends on the circumstances under which the supplemental instruction is given and the content of the instruction.

[20] An *Allen* charge "is the generic name for a class of supplemental jury instructions given when jurors are apparently deadlocked." *United States v. Mason*, 658 F.2d 1263, 1265 n.1 (9th Cir. 1981). Because "the fundamental question is whether the jury was improperly coerced, thus infringing the defendant's due process rights . . . courts have not hesi-

tated to apply an *Allen* charge analysis . . . where the jury has not yet reached a deadlock." *Weaver v. Thompson*, 197 F.3d 359, 365 (9th Cir. 1999) (citing *United States v. Wills*, 88 F.3d 704, 716-17 (9th Cir. 1996)). "So long as the defendant has offered facts that fairly support an inference that jurors who did not agree with the majority felt pressure from the court to give up their conscientiously held beliefs in order to secure a verdict, we must proceed to the *Allen* charge analysis." *Id.*

**[21]** The facts presented by Williams, Steel, and Brown clearly "support an inference" that a juror who disagreed with the majority felt pressure from the court to give up her conscientiously held belief. *Id.* The juror's note to the judge stated that she felt "very strong" about her decision and that she disagreed with her fellow jurors, who she felt had already convicted the defendants "on all accounts." She named specific issues material to the determination of guilt, which she said she could not "get pas[t]." She also said she "could not face the defendants" with the charges that the other jurors wished to sustain. In response to that unambiguously worded note, the district court instructed the jury to continue deliberating and for the jurors to consider changing positions "if the discussion persuades you that you should." This kind of situation is the precise type of situation for which the *Allen* framework has been developed: Juror No. 1 knew that the judge knew her position and reasonably—in fact, more than likely—could have interpreted the supplemental instruction to be directed at her.

Moreover, the district court's supplemental instruction resembled instructions in other cases involving *Allen* charges because it "carr[ied a] reminder[ ] of the importance of securing a verdict and ask[ed] jurors to reconsider potentially unreasonable positions." *Mason*, 658 F.2d at 1265 n.1. For example, in *United States v. Steele*, the district court instructed the jury that they had "the duty to discuss the case with one another and to deliberate in an effort to reach a unanimous verdict if each of you can do so without violating your

individual judgment and conscious [sic]." 298 F.3d 906, 910 (9th Cir. 2002). Similarly, the district court in this case said, "I want all of you to discuss the case with your fellow jurors to reach an agreement if you can do so. Your verdict, whether guilty or not guilty, must be unanimous." The *Allen* charge in *Steele* read:

> During your deliberations you should not hesitate to reexamine your own views and change your opinion if you are now persuaded that it is wrong. However, you should not change an honest belief . . . solely because [of] the opinions of your fellow jurors or for the mere purpose of returning a verdict. . . . Each of you should ask yourself whether you should question the correctness of your present position.

298 F.3d at 910. The district court in this case said, "Do not be afraid to change your opinion if the discussion persuades you that you should, but do not come to a decision simply because the other jurors think it is right." We analyzed the instruction given in *Steele* as an *Allen* charge, albeit a "neutral form" of the *Allen* charge, which in the circumstances of that case was not unduly coercive. *Id.* at 910-11. The supplemental instruction given in this case is not materially different from the instruction given in *Steele*.

**[22]** We therefore conclude that the district court, although it did not intend to do so, gave a "neutral form" of the *Allen* charge. We now analyze the instruction as an *Allen* charge.

2

**[23]** *Allen* "charges are proper 'in all cases except those where it's clear from the record that the charge had an impermissibly coercive effect on the jury.' " *United States v. Banks*, 514 F.3d 959, 974 (9th Cir. 2008) (quoting *United States v. Ajiboye*, 961 F.2d 892, 893 (9th Cir. 1992)). If the trial judge gives an *Allen* charge after inquiring into the numerical divi-

sion of the jury, "the charge is per se coercive and requires reversal." *Ajiboye*, 961 F.2d at 893-94. "Even when the judge . . . is inadvertently told of the jury's division, reversal is necessary if the holdout jurors could interpret the charge as directed specifically at them—that is, if the judge knew which jurors were the holdouts *and* each holdout juror knew that the judge knew he was a holdout." *Id.* at 894 (citing *United States v. Sae-Chua*, 725 F.2d 530, 532 (9th Cir. 1984)).

Williams, Brown, and Steel principally rely on *Sae-Chua* to support their argument that reversal is required because of the district court's supplemental instruction. They argue the district court knew the identity of the holdout juror (Juror No. 1) and Juror No. 1 knew the district court knew her identity. In that situation, any *Allen* charge is impermissibly coercive and requires a mistrial. *See Sae-Chua*, 725 F.2d at 532.

In *Sae-Chua*, the jury foreperson notified the court on the second day of deliberations that one juror refused to vote guilty even though that juror believed the defendant was in fact guilty. 725 F.2d at 531. The court brought the jury into the courtroom to poll them about whether they believed further deliberations would result in a verdict. Eleven jurors indicated their belief that a verdict could be reached; one juror indicated that a verdict could not be reached. *Id.* The court gave an *Allen* charge, and the jury returned a guilty verdict after several more hours of deliberation. *Id.* Reversing the verdict because the supplemental instruction was improperly coercive, we noted that an important consideration is whether the judge giving the *Allen* charge "was unaware of the nature or extent of numerical division." *Id.* We reasoned that, in the circumstances presented in *Sae-Chua*, "the most rational inference to be drawn was that the eleven who favored continued deliberations constituted the majority favoring conviction and that the one who felt further deliberations would be fruitless was the juror to whom the foreman had referred in his note." *Id.* at 532. "Under these circumstances the charge could only be read by the dissenting juror as being leveled at him."

*Id.* We found it critical that both the judge and the dissenting juror knew that the judge was aware of the dissenting juror's identity. *Id.*; *see also Ajiboye*, 961 F.2d at 894.

In other situations, where the numerical division of the jury has been disclosed, but the votes of individual jurors has not, we have not reversed. For example, in *United States v. Changco*, 1 F.3d 837 (9th Cir. 1993), the foreperson sent a note to the court indicating that one juror was holding out. We upheld the district court's supplemental instruction telling the jury not to disclose its numerical division again, urging the jury to continue deliberating to try to reach a verdict, and instructing them not to surrender conscientiously-held beliefs. *Id.* at 842. Similarly, in *United States v. Green*, 962 F.2d 938 (9th Cir. 1992), the jury disclosed its numerical division but "did not indicate that further deliberations would be fruitless." *Id.* at 944. For that reason, we concluded that "a mistrial would have been premature." *Id.* In neither case did the district court know how any individual juror had voted.

Although this case is similar to *Green* and *Changco* and different from *Sae-Chua* in some respects, the core problem present in *Sae-Chua* is present here. Unlike in *Sae-Chua*, the district court did not poll the jurors before giving the supplemental instruction. As in *Green*, the jury foreperson did not indicate that further deliberations would be fruitless.[15] In fact, the district court had no indication, from the foreperson or any other juror, that an actual vote had been taken or what the results of any vote were, for the juror's note indicated only that she "fe[lt] the other jur[o]rs have already convicted the three defendants on all accounts," but did not say that a vote had been taken or what the positions of the other jurors were. As in *Green* and *Changco*, the supplemental instruction given

---

[15]The note from Juror No. 1 did inform the court that at least she did not feel that further deliberations would be helpful. Juror No. 1 felt strongly enough about the issue to stop deliberations until the foreperson sent the note to the court.

by the district court in response to the note was a neutral variety of an *Allen* charge. It simply encouraged the jurors to reach a unanimous verdict "only if each of you can do so after having made your own conscientious decision." The instruction is virtually identical to the instruction given in *Changco* and *Green*. *See Changco*, 1 F.3d at 842; *Green*, 962 F.2d at 944.

**[24]** These differences are overshadowed by the most important consideration: There is no indication in *Changco* and *Green* that the district court knew the identity of the holdout jurors when the *Allen* charge was given.[16] But here, after Juror No. 1 passed her note to the district judge, the district judge knew the identity of a juror who, in the words of the juror, "fe[lt] very strong about my decision and could not face the defendants with the charges the other jur[o]rs are hard on declaring," and who indicated that she would "not be bombarded to change my opinion." Juror No. 1 obviously knew that the court knew her identity. The situation precisely fits the problem that the *Ajiboye* court described:[17] "Even when

[16]*Changco* is ambiguous as to whether the district judge knew the identity of the holdout juror at the time the *Allen* charge was given. In that case, the note to the court from the foreperson said, "Can't convince one person. Don't know what to do. Set mind before case. She can't hear well and is not looking at evidence." 1 F.3d at 842. Describing a separate incident with the jury that Changco also appealed, we wrote: "The second incident arose . . . when an individual juror (the same juror, it turns out, who was the subject of the first note) passed a note to the judge, claiming she was being intimidated, harassed and physically threatened by other jurors." *Id.* The *Changco* court gave no indication as to how it knew that the same juror was the subject of both notes, but it also did not indicate that the district judge knew the identity of the holdout at the time of the supplemental instruction or, importantly, that the holdout juror knew that the judge knew her identity.

[17]In fact, this case presents a stronger argument for application of the *Sae-Chua* rule than *Sae-Chua* itself. In *Sae-Chua*, we reversed based on an inference that the juror who felt further deliberations would not be fruitful was the holdout juror referenced in the foreperson's note. Here, there is no doubt about the identity of the holdout juror, or that the juror knew the district court knew her identity, because the juror sent a note directly to the district judge.

the judge does not inquire but is inadvertently told of the jury's division, reversal is necessary if the holdout jurors could interpret the charge as directed specifically at them—that is, if the judge knew which jurors were the holdouts *and* each holdout juror knew that the judge knew he was a holdout." *Ajiboye*, 961 F.2d at 894 (citing *Sae-Chua*, 725 F.2d at 532). *Ajiboye* and *Sae-Chua* required the district court to declare a mistrial in these circumstances.[18]

[25] That there was no indication here that the jury had taken a vote or that the foreperson believed that further deliberations would not be productive does not change our conclusion. When a juror clearly discloses to the district court that she disagrees with the rest of the jury and that she cannot return a different verdict, as Juror No. 1 disclosed here, the district court cannot give a supplemental instruction instructing the jury to continue deliberating.[19] *Ajiboye*, 961 F.2d at 894; *Sae-Chua*, 725 F.2d at 532.

[26] Accordingly, the district court abused its discretion in denying the appellants' motion for a mistrial.

### III

We REVERSE the judgment of the district court and REMAND for a new trial.

---

[18]In reaching this conclusion, we are aware of the conscientious effort that the district court made to avoid a mistrial after a lengthy trial, and we commend the district court for that effort. In this circumstance, as our opinion today makes clear, nothing could have prevented a mistrial.

[19]The district court is free to give supplemental instructions so long as the judge does not know the identity of the jurors that are the holdouts.