**Opinion issued March 31, 2022**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-19-00776-CR

## NO. 01-19-00818-CR

————————————

**LAMELVIN DEWAYNE JOHNSON, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 434th District Court**
**Fort Bend County, Texas**
**Trial Court Case Nos. 13-DCR-064483B, 15-DCR-069514A**

---

## MEMORANDUM OPINION

A jury convicted Appellant, LaMelvin DeWayne Johnson, of one count of capital murder and one count of the first-degree felony offense of murder.[1] The State

---

[1] *See* TEX. PENAL CODE §§ 19.02(b) (murder), 19.03(a)(7) (person commits capital murder if person murders more than one person during same criminal transaction).

sought imposition of the death penalty for the capital murder charge, but the jury found that mitigating evidence precluded imposition of the death penalty. The trial court therefore assessed Appellant's punishment at confinement for life without the possibility of parole on the capital murder charge. The trial court also assessed Appellant's punishment at confinement for life on the murder charge.

In three issues, Appellant contends that the trial court (1) abused its discretion by denying his *Batson* challenge to a prospective juror;[2] (2) erroneously excluded expert testimony, depriving him of his right to present a complete defense; and (3) erroneously refused to give a requested instruction on the defense of mistake of fact. We affirm.

## Background

Appellant shot and killed three people on September 29, 2013, at the car wash where he had worked. It is undisputed that Appellant was the person who shot the three complainants—Harvey Simmons, Johnny Simmons, and Donntay Borom— but the parties presented conflicting evidence concerning the events leading up to the shooting as well as whether Appellant acted in self-defense.

### A. *The Shooting*

Harvey Simmons owned and operated a car wash in Stafford, Texas. He employed several people at the car wash, including his uncle Johnny Simmons,

---

[2] *See Batson v. Kentucky*, 476 U.S. 79 (1986).

Donntay Borom, Ronald Walker, Shaquiel Oliver, Chantiqua Perkins, Darryl Hines, and Appellant. All the employees were present at the car wash on the day of the shooting. Walker, Oliver, and Perkins all testified that the work environment at the car wash was generally positive, but Appellant caused friction amongst the employees and occasionally made negative comments about Harvey behind his back to the other employees. Harvey learned of these comments. A day or two before the shooting, Harvey mentioned to Oliver and Hines that he was thinking of firing Appellant.

The car wash had a contract with BMW to wash and detail certain cars during home games for the Houston Texans at NRG Stadium. Unbeknownst to most of the employees, Harvey and BMW had been engaged in a dispute over the contract for several weeks leading up to the underlying incident, and it was uncertain whether the contract was still in force. On the morning of the incident, the car wash employees gathered at the car wash before carpooling to NRG Stadium. Harvey told the employees to start washing cars, but they were only at NRG Stadium for fifteen to twenty minutes before they were informed that the contract had been cancelled and they needed to leave.

Upon returning to the car wash, Harvey called a meeting to discuss what happened with the contract. All the employees gathered in, or just outside, a small garage on the property. Harvey, Johnny, and Donntay were all inside the garage.

3

Harvey began the meeting by apologizing for being unable to follow through with the contract, and he stated that he still intended to pay everyone for their time. Harvey then asked if any of the employees had any issues with him. When no one responded, Harvey asked Appellant specifically if he had a problem. According to Oliver, Appellant said, "If I have a problem with you I would say it to your face." Harvey fired Appellant but promised to pay him for that day and the previous week.

After a heated argument, Appellant walked out of the garage. Walker then heard Harvey say, "All you going to do is go get a gun." Walker did not hear any threats by either Harvey or Appellant during this conversation. Oliver did not hear Harvey or anyone else threaten Appellant with a weapon or talk about getting a weapon. Perkins testified that Appellant used profanity and called Harvey names, but Appellant did not threaten Harvey and Harvey did not threaten Appellant. She stated that nobody mentioned having a weapon, and nobody reached into their pockets as if reaching for a weapon.

Walker was standing just outside the garage, and he saw Appellant casually walk to his vehicle after Harvey fired him. No one followed Appellant to his vehicle or threatened to follow him. Walker saw Appellant reach under the driver's seat and pull out a gun. When Appellant walked back toward the garage, Walker attempted to intervene and de-escalate the situation. He grabbed Appellant's hand holding the

4

gun and told him, "Hey, man, it's not worth it." Hines also tried to intervene, saying, "[I]t's not worth all that."

Appellant was focused on Harvey, and he pushed past Walker and Hines and continued to the garage. By this point, Harvey had moved from inside the garage to stand next to a truck that was parked parallel to the garage. He was holding money in his hands. Johnny and Donntay were still inside the garage. Harvey "froze" when he saw Appellant with the gun, and he did not say anything or move after Appellant raised the gun. According to Perkins, as he walked towards Harvey, Appellant threatened to kill Harvey. Harvey did not say anything in response, nor did he—or anyone else—move.

Appellant walked around the end of the truck and shot at Harvey, but the gun jammed. After the gun jammed, Walker and Hines tried to intervene a second time. Perkins heard Appellant tell them, "Move. If you don't move, I'll kill you too." According to Hines, Appellant said, "Man, move, I'm going to the penitentiary today." Appellant then shot Harvey. After Appellant shot Harvey, Walker heard Appellant say, "You going to get some of this too," followed by two more gunshots.

Walker ran away and called 911. But as he ran, he looked back and saw Appellant standing over Harvey and heard approximately twelve or thirteen more gunshots. Appellant walked back to his vehicle and left the scene. After Appellant left, Walker returned to the scene and waited for police.

5

Perkins ran away when the shooting started, but she looked back and saw Appellant shoot Donntay, who was sitting in a folding chair inside the garage and using his phone. Donntay did not jump up from his chair or say anything. Hines also recounted the shooting. He testified that Donntay and Johnny were still seated inside the garage when the shooting started, and Hines heard Appellant ask, "Do you want some?" Appellant then started shooting again. Hines did not recall either Donntay or Johnny jumping up or saying anything. Although Hines ran away after these shots, he looked back and saw Appellant standing over Harvey before firing another shot or two. Appellant then walked back to his car and left the scene.

Appellant testified on his own behalf. Shortly after Appellant began working at the car wash, Harvey made him an assistant manager. Prior to the day of the shooting, Appellant had not had any altercations with Harvey, and he did not know that Harvey intended to fire him. On the day of the shooting, Appellant and the other employees prepared to go to NRG Stadium, but Appellant was aware that the car wash's contract with BMW had already been canceled. According to Appellant, Harvey held a meeting before leaving for NRG Stadium and in this meeting, he told everyone that the contract had been canceled but they were going to show up anyway and hope the contract would be renewed. Harvey also told all the employees that even if the contract was not renewed, he would still pay the employees.

When they arrived back at the car wash, Appellant attempted to speak with Harvey to get his pay a day early. Harvey did not give Appellant his pay. Instead, he called a meeting of all the employees. Harvey started the meeting by asking if there was anyone present who did not want to be there. When nobody answered, Harvey asked, "Well, what about you, [Appellant]?" Appellant responded, "Man, you know, if I didn't want to be here I wouldn't be here. This ain't my only source of income." Harvey became angry and accused Appellant of "always talking down on [him]." The conversation became heated, and eventually Appellant left the garage and walked toward his car.

According to Appellant, the situation escalated after he left to go to his car. He testified that when he reached his car door, Harvey said, "You better get your bitch ass here before we put you in the hospital." Appellant responded, "You got to be fucked up, you ain't going to put me nowhere." Harvey then attempted to punch him, and Appellant tried to get inside his car. Appellant was able to deflect many of the blows directed at his face, but then he saw two people—Johnny and Donntay— behind Harvey. Johnny and Donntay were helping Harvey, with Johnny hitting Appellant's legs and Donntay kicking Appellant in the groin. Harvey hit Appellant in his neck and back, and when Appellant tried to climb under the steering wheel of his car, he saw his gun under the driver's seat. Appellant testified, "I pulled the gun and I rack one in and I just started shooting." Appellant stated that he did not intend

to kill any of the complainants, but he believed his life was threatened. Appellant then fled the scene and disposed of the gun by throwing it out of his car window. After speaking with his cousin and his mother, Appellant turned himself in to the Stafford Police Department the next day.

Hines also testified that Harvey had threatened Appellant. According to Hines, Harvey threatened Appellant during the argument in the garage. Appellant responded by saying, "No, you're not going to do anything to me." Hines could not recall Harvey's exact words, but Hines said that "[i]t was enough to make, you know, make you feel uneasy, like you're being threatened." Hines acknowledged that he had previously given a statement to police shortly after the shooting, but that the prior statement omitted any mention of Harvey threatening Appellant. Hines was brought to the Fort Bend County Jail several days before his testimony. He saw Appellant in the jail and they had a conversation. Hines testified that Appellant asked "could I help him," and Hines responded, "[Y]eah, if I can, I'll help you." Hines testified, "He gave me a story other than what I had stated on tape six years ago."

In addition to the shooting, Appellant also testified about his upbringing. When Appellant was a child, his mother was involved in a long-term relationship with an abusive boyfriend, and Appellant testified concerning abuse that his mother experienced as well as abuse that he experienced. Appellant grew up in a poverty-stricken neighborhood, and he frequently witnessed drug deals and shootings.

8

Appellant was regularly bullied when he was in school, and when he was fourteen, he was stabbed in the temple by a classmate. He also got into a fight with someone who later walked up to his house and fired a gun through the window into the house.

When Appellant was sixteen, he got into a physical fight with his mother's boyfriend and ran away from home. He slept in vacant apartments for around three months and started selling drugs during this time. Appellant has a 1995 conviction for possession of a controlled substance, a 2000 conviction for possession of a controlled substance, a 2007 conviction for criminal mischief, and a 2007 conviction for attempted deadly conduct.

## B.    The Trial

The trial court instructed the jury on one count of capital murder relating to the shooting of Harvey and Johnny during the same criminal transaction and one count of murder relating to the shooting of Donntay. The trial court also instructed the jury on the lesser-included offenses of murder and manslaughter and instructed the jury on the defenses of self-defense and necessity. The trial court refused Appellant's requested instruction on mistake of fact relating to his allegedly mistaken belief that deadly force was immediately necessary to defend himself against the complainants' use of deadly force.

The jury found Appellant guilty of both capital murder and murder. The State sought the death penalty. During the punishment phase of trial, the jury found that

sufficient mitigating evidence existed such that the death penalty should not be imposed. The trial court therefore assessed Appellant's punishment on the capital murder charge at confinement for life without the possibility of parole. The court assessed punishment on the murder charge at confinement for life. This appeal followed.

**Batson Challenge**

In his first issue, Appellant argues that the State impermissibly used a peremptory strike against Veniremember 43 ("Juror 43") on the basis of that juror's race, and the trial court abused its discretion by denying Appellant's challenge to the strike made pursuant to *Batson v. Kentucky*.

## A.    *Standard of Review*

In *Batson v. Kentucky*, the United States Supreme Court held that the Equal Protection Clause of the Fourteenth Amendment prohibits a prosecutor from exercising peremptory strikes based solely on the potential juror's race. *See* 476 U.S. 79, 89 (1986); *Nieto v. State*, 365 S.W.3d 673, 675 (Tex. Crim. App. 2012); *see also* TEX. CODE CRIM. PROC. art. 35.261 (codifying *Batson*). "In the eyes of the Constitution, one racially discriminatory peremptory strike is one too many." *Flowers v. Mississippi*, 139 S. Ct. 2228, 2241 (2019).

The Supreme Court has established a three-step process for trial courts to use in determining claims that a peremptory strike was based on the juror's race. *Snyder*

*v. Louisiana*, 552 U.S. 472, 476 (2008). First, a defendant must make a prima facie showing that the State has exercised a peremptory challenge on the basis of the juror's race. *Id.*

If the defendant makes that showing, then at the second step, the State must offer a race-neutral basis for striking the prospective juror. *Id.* at 476–77. Significantly, the State "need only tender an explanation that is racially neutral on its face." *Blackman v. State*, 414 S.W.3d 757, 764–65 (Tex. Crim. App. 2013). This step "does not demand an explanation that is persuasive, or even plausible." *Purkett v. Elem*, 514 U.S. 765, 767–68 (1995) (per curiam). The issue is the "facial validity of the prosecutor's explanation," and "[u]nless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *Id.* at 768 (quoting *Hernandez v. New York*, 500 U.S. 352, 360 (1991) (plurality op.)). "A neutral explanation in the context of our analysis here means an explanation based on something other than the race of the juror." *Hernandez*, 500 U.S. at 360 (plurality op.).

"Where the State has offered a race-neutral explanation for the strikes, the defendant must prove that the prosecutor's reasons were merely a sham or pretext." *Adair v. State*, 336 S.W.3d 680, 686 (Tex. App.—Houston [1st Dist.] 2010, pet. ref'd). At this third and final step of the analysis, the trial court considers the ultimate plausibility of the State's explanation. *Blackman*, 414 S.W.3d at 765; *see Batson*,

11

476 U.S. at 98 (stating that once State tenders race-neutral explanation, trial court has duty to determine whether defendant has established purposeful discrimination). The trial court must determine whether the stated reasons for the strike "were the actual reasons or instead were a pretext for discrimination." *Flowers*, 139 S. Ct. at 2241. We must uphold the trial court's ruling on appeal unless it is clearly erroneous. *Snyder*, 552 U.S. at 477; *Blackman*, 414 S.W.3d at 765.

***B.*** ***Analysis***

When defense counsel made a *Batson* challenge to the State's peremptory strike of Juror 43, the State gave an explanation for its peremptory strike. "Because the State offered its reasons for the strike, the prima facie case inquiry is moot, and we move on to whether the reasons offered are in fact race-neutral." *Johnson v. State*, 68 S.W.3d 644, 649 (Tex. Crim. App. 2002); *Jones v. State*, 431 S.W.3d 149, 155 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd).

Turning to *Batson* step two, we determine whether the prosecution exercised its peremptory strike based on "something other than the race of the juror." *Hernandez*, 500 U.S. at 360 (plurality op.). In answering this question, "the trial court does not consider any disparate treatment of panelists or other evidence tending to show that the explanation is pretextual; these matters are considered as part of the third step of a *Batson* challenge." *Jackson v. Stroud*, 539 S.W.3d 502, 507 (Tex. App.—Houston [1st Dist.] 2017, no pet.); *see Snyder*, 552 U.S. at 483–85

(conducting comparative juror analysis as part of third step of *Batson* inquiry); *Jones*, 431 S.W.3d at 155–59 (considering disparate treatment of panelists as part of third step).

Juror 43 and Appellant are both African Americans. When defense counsel raised a *Batson* challenge to the State's peremptory strike on Juror 43, the State responded that it was exercising its peremptory strike based on Juror 43's stated concerns in a juror questionnaire that the death penalty is used "too often on people of color and low income people who can't hire a good lawyer"; "a lot of innocent, unrepresented people have died in vain" due to the death penalty; "race plays an important role in a person's conviction"; "people are less likely convicted against people of color"; and "racism within the system needs to be fixed." The State also pointed to Juror 43's statement in individual voir dire that he believed the death penalty was warranted in a lot of cases but also feels "like a lot of people are railroaded." Upon further questioning by the court, the prosecution reiterated that it was exercising its peremptory strike on Juror 43 because he "has a lens through which he looks at the evidence because of his feeling that the system is set up to where minorities are—receive a harsher sentence or punishment."

In *Pondexter v. State*, the Court of Criminal Appeals held that the State does not violate *Batson* step two by striking a veniremember based on stated concerns regarding unfairness in the criminal justice system. *See* 942 S.W.2d 577, 581 (Tex.

Crim. App. 1996). The State defended its peremptory strike of a minority juror for reasons including her belief "that the criminal justice system is fair 'sometimes.'" *Id.* The Court of Criminal Appeals held that the State had asserted race-neutral reasons for the strike, ultimately affirming the denial of the defense's *Batson* challenge. *Id.* at 581–82.

Like the Court of Criminal Appeals in *Pondexter*, federal courts and other state supreme courts uniformly hold that *Batson* does not prohibit the state from striking a juror based upon the juror's expressed concerns about the criminal justice system. *United States v. Steele*, 298 F.3d 906, 914 (9th Cir. 2002) (holding that juror's expressed view that "racial discrimination may taint the criminal justice system" was race-neutral justification); *Tolbert v. Gomez*, 190 F.3d 985, 989 (9th Cir. 1999) ("[C]hallenging a prospective juror on the basis of his expressed opinions about the judicial system does not violate *Batson.*"); *United States v. Fike*, 82 F.3d 1315, 1320 (5th Cir. 1996) (juror's stated concerns about racism in judicial system was race-neutral justification for strike), *overruled on other grounds by United States v. Brown*, 161 F.3d 256 (5th Cir. 1998); *People v. Armstrong*, 433 P.3d 987, 1025–26 (Cal. 2019); *People v. Hardy*, 418 P.3d 309, 330 (Cal. 2018) ("A prospective juror's distrust of the criminal justice system is a race-neutral basis for his excusal."); *State v. King*, 735 A.2d 267, 282–83 (Conn. 1999) (juror's expressed "views about the unfairness of certain aspects of the criminal justice system" were

14

race-neutral justification for strike); *State v. Martin*, 773 N.W.2d 89, 101–04 (Minn. 2009).

In so holding, those courts point to the nature of *Batson*'s prohibition: "*Batson* does not forbid striking a juror who holds a particular opinion about the U.S. justice system. Rather, it forbids striking jurors based on their race." *Fike*, 82 F.3d at 1320. They reason that striking a potential juror based upon a juror's stated opinion is race neutral because any person—regardless of race—can hold the same view. *See Steele*, 298 F.3d at 914; *Tolbert*, 190 F.3d at 989; *Armstrong*, 433 P.3d at 1026. Even so, courts have found *Batson* violations where, for example, the prosecution poses questions about racial injustice only to prospective jurors of a particular race. *See People v. Mallory*, 993 N.Y.S.2d 609, 611–12 (N.Y. App. Div. 2014) (reversing and granting new trial under *Batson* where prosecutor directed question about whether police officers "unfairly target members of the minority community" only to "black prospective jurors and not their white counterparts"). This analysis, however, comes at the final step of the *Batson* analysis—determining whether the State's justifications are mere pretexts for the racial discrimination that *Batson* prohibits. *See Jones*, 431 S.W.3d at 155–59 (conducting comparative analysis as part of third step of *Batson* inquiry).

Because *Pondexter* is binding on our Court, we are compelled to hold that the State satisfied its *Batson* step-two burden. *See Winzer v. State*, No. 05-14-01079-

15

CR, 2015 WL 4931418, at \*4 (Tex. App.—Dallas Aug. 18, 2015, pet. ref'd) (mem. op., not designated for publication) (following *Pondexter* as controlling where veniremember expressed concerns about racial bias in criminal justice system); *Stoglin v. State*, No. 03-03-00146-CR, 2004 WL 1171433, at \*2–3 (Tex. App.— Austin May 27, 2004, no pet.) (mem. op., not designated for publication) (same); *cf. Harris v. State*, AP-76,810, 2014 WL 2155395, at \*9 (Tex. Crim. App. May 21, 2014) (mem. op., not designated for publication). We therefore proceed to *Batson*'s third and final step, determining whether Appellant carried his burden of establishing that the prosecutor's reason was merely a sham or pretext.

The Texas Legislature enacted Code of Criminal Procedure article 35.261 to codify and implement *Batson*. TEX. CODE CRIM. PROC. art. 35.261. Whenever a defendant makes a claim that veniremembers have been peremptorily challenged based on race, article 35.261 must be followed. *Hill v. State*, 827 S.W.2d 860, 863 (Tex. Crim. App. 1992). To be timely, the statute requires that the defendant make the *Batson* challenge "[a]fter the parties have delivered their lists [of peremptory strikes] to the clerk under Article 35.26 of this code and before the court has impanelled the jury." TEX. CODE CRIM. PROC. art. 35.261; *Hill*, 827 S.W.2d at 863; *Saldivar v. State*, 980 S.W.2d 475, 482–84 (Tex. App.—Houston [14th Dist.] 1998, pet. ref'd). The jury is "impanelled" when the members of the jury have been selected and sworn. *Hill*, 827 S.W.2d at 864. *Batson* error is subject to principles of

16

ordinary procedural default. *Batiste v. State*, 888 S.W.2d 9, 17 n.5 (Tex. Crim. App. 1994).

Appellant's counsel did not argue that the State's reasons were pretextual or a sham until after the trial court had sworn the jury and released the veniremembers who were not chosen.[3] Prior to that point, Appellant's counsel focused exclusively on whether the State had satisfied *Batson* step two. He did not "even make a general argument that he believed the [State's] explanations to be a pretext." *See Adair*, 336 S.W.3d at 689 n.6. As such, Appellant waived a *Batson* step-three challenge.

Assuming, however, that Appellant has not waived this issue, in conducting the step-three analysis, courts have identified numerous factors that tend to show purposeful racial discrimination when present. These factors include statistical analysis of the percentage of prospective jurors of a particular race that are struck during voir dire; disparate treatment of prospective jurors, where the State's explanations for striking jurors of a particular racial group apply equally to members

---

[3] At this point, because the unchosen veniremembers had been released, the trial court's only remedy would have been a mistrial. Appellant disagrees, arguing that the trial court could have seated Juror 43. As support, Appellant cites caselaw holding that reinstatement of an improperly challenged prospective juror is an appropriate remedy for a *Batson* violation. *See State ex rel. Curry v. Bowman*, 885 S.W.2d 421, 425 (Tex. Crim. App. 1993); *Degar v. State*, 482 S.W.3d 588, 591 (Tex. App.—Houston [1st Dist.] 2015, pet. ref'd); *see also Craig v. State*, 82 S.W.3d 451, 453 n.1 (Tex. App.—Austin 2002, pet. ref'd) (concluding that no *Batson* violation occurred but noting that reinstatement of challenged juror is appropriate remedy for violation). *Curry* and *Degar* are both factually distinguishable because the jury had not been sworn when the *Batson* challenge was made.

17

of another race who were not struck; use of jury shuffles when a large number of prospective jurors of a particular race are seated at the beginning of the panel; disparate questioning of prospective jurors, where the State asks questions in such a way that is designed to elicit objectionable responses only from members of a particular racial group; a general policy by the district attorney's office to exclude members of a particular race from juries; whether members of a particular racial group are not questioned before being struck; and the extent to which the record contradicts the State's explanation for the strikes. *See, e.g.*, *Miller-El v. Dretke*, 545 U.S. 231, 240–65 (2005); *Nieto*, 365 S.W.3d at 678–79; *Jones*, 431 S.W.3d at 155–56.

The problem here is that the appellate record does not contain evidence concerning the racial makeup of the venire or the jury. Neither the jury cards nor the jury questionnaires are in the record. Thus, we cannot perform a statistical analysis such as that performed in *Miller-El*, where the evidence reflected that the State exercised its peremptory strikes in such a way as to exclude 91% of eligible African American prospective jurors. *See* 545 U.S. at 240–41; *see also Bundage v. State*, 470 S.W.3d 227, 236 (Tex. App.—Houston [1st Dist.] 2015, no pet.) (noting that appellate court cannot determine whether disproportionate number of strikes were used to challenge African American prospective jurors when record contained no evidence of racial composition of venire).

Likewise, we cannot make any findings of disparate questioning. Juror 43 was the only veniremember questioned about racial injustice in the criminal justice system, but we do not know how many other African Americans were on the venire panel. Nor do we know how other veniremembers answered the inquiries on the questionnaire that Juror 43 answered. And there is no evidence in the record that the prosecutorial office had a practice of excluding African Americans from juries. We therefore hold that Appellant has not demonstrated that the trial court's *Batson* ruling was clearly erroneous. *See Blackman*, 414 S.W.3d at 765 ("[A] reviewing court should examine a trial court's conclusion that a racially neutral explanation is genuine, not a pretext, with great deference, reversing only when that conclusion is, in view of the record as a whole, clearly erroneous."). We overrule Appellant's first issue.

**Exclusion of Expert Testimony**

In his second issue, Appellant contends that the trial court erred by excluding, during the guilt-innocence phase, the expert testimony of Dr. Jolie Brams, which deprived him of his right to present a complete defense.

*A.* *Standard of Review and Governing Law*

We review a trial court's decision to exclude evidence for an abuse of discretion. *Gonzalez v. State*, 544 S.W.3d 363, 370 (Tex. Crim. App. 2018). We will uphold the trial court's decision if it falls within the "zone of reasonable

19

disagreement." *Beham v. State*, 559 S.W.3d 474, 478 (Tex. Crim. App. 2018). We may not substitute our own decision for that of the trial court. *Gonzalez*, 544 S.W.3d at 370.

Texas Rule of Evidence 702 provides that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." TEX. R. EVID. 702. Expert testimony that assists the jury in determining a fact in issue is admissible. *Flores v. State*, 513 S.W.3d 146, 162 (Tex. App.—Houston [14th Dist.] 2016, pet. ref'd); *Echavarria v. State*, 362 S.W.3d 148, 153 (Tex. App.—San Antonio 2011, pet. ref'd) ("An expert's testimony is not admissible unless it will 'assist the trier of fact to understand the evidence or to determine a fact in issue.'") (quoting TEX. R. EVID. 702).

Code of Criminal Procedure article 38.36 specifically addresses evidence in prosecutions for murder and provides:

(a)    In all prosecutions for murder, the state or the defendant shall be permitted to offer testimony as to all relevant facts and circumstances surrounding the killing and the previous relationship existing between the accused and the deceased, together with all relevant facts and circumstances going to show the condition of the mind of the accused at the time of the offense.

(b)    In a prosecution for murder, if a defendant raises as a defense a justification provided by Section 9.31, 9.32, or 9.33, Penal Code

20

[self-defense or defense of a third person], the defendant, in order to establish the defendant's reasonable belief that use of force or deadly force was immediately necessary, shall be permitted to offer:

(1) relevant evidence that the defendant had been the victim of acts of family violence committed by the deceased, as family violence is defined by Section 71.004, Family Code; and

(2) relevant expert testimony regarding the condition of the mind of the defendant at the time of the offense, including those relevant facts and circumstances relating to family violence that are the basis of the expert's opinion.

TEX. CODE CRIM. PROC. art. 38.36; *Ruffin v. State*, 270 S.W.3d 586, 596 (Tex. Crim. App. 2008) (stating that article 38.36 "is one of the few Texas statutes that explicitly states the obvious: evidence offered by either the defense or prosecution is relevant (and presumptively admissible) to prove or disprove the pertinent *mens rea* at the time of the offense"). Relevant evidence is "evidence which has any tendency to make the existence of any fact of consequence more or less probable than it would be without the evidence." *Gonzalez*, 544 S.W.3d at 370; TEX. R. EVID. 401. To be relevant, evidence does not need to prove or disprove a particular fact by itself; instead, it is sufficient if the evidence "provides a small nudge toward proving or disproving a fact of consequence." *Gonzalez*, 544 S.W.3d at 370.

Texas courts have generally rejected attempts to offer any testimony, other than that of the defendant, concerning his mental state at the time of the offense. *Avila v. State*, 954 S.W.2d 830, 839 (Tex. App.—El Paso 1997, pet. ref'd); *Osby v.*

21

*State*, 939 S.W.2d 787, 791 (Tex. App.—Fort Worth 1997, pet. ref'd); *see also*

*Fairow v. State*, 943 S.W.2d 895, 899 (Tex. Crim. App. 1997) ("It is impossible for

a witness to possess personal knowledge of what someone else is thinking. The

individual is the only one who knows for certain the mental state with which he is

acting."); *Jackson v. State*, 548 S.W.2d 685, 692–93 (Tex. Crim. App. 1977)

(upholding trial court's refusal to allow psychiatrist to testify concerning defendant's

state of mind at time of alleged offense). In 1988, the Court of Criminal Appeals

created a narrow exception to this rule to allow expert testimony concerning the

mental state of a defendant at the time of a killing where the defendant had been a

victim of domestic violence. *See Fielder v. State*, 756 S.W.2d 309, 318–21 (Tex.

Crim. App. 1988); *Avila*, 954 S.W.2d at 839; *Osby*, 939 S.W.2d at 790. The Texas

Legislature subsequently codified the rule in *Fielder* as article 38.36(b). *See Osby*,

939 S.W.2d at 790.

Testimony from the defendant himself concerning facts relevant to his mental

state at the time of the offense is admissible under article 38.36(a), even if the case

does not involve family violence. *Avila*, 954 S.W.2d at 840. However, *expert*

testimony concerning the condition of the defendant's mind at the time of the offense

is inadmissible under article 38.36(a). *Id.* at 841; *Osby*, 939 S.W.2d at 790 (noting

that post-*Fielder*, Texas Legislature amended predecessor statute to article 38.36 to

add what is now article 38.36(b), and addition of subsections of article 38.36(b) "is

22

some indication that the legislature intended expert testimony about the defendant's state of mind to be admissible only in cases where the deceased had previously committed acts of family violence against the accused"). Construing article 38.36 as a whole, our sister courts have held that the Legislature intended for expert testimony "to be admissible only when the expert's opinion about the defendant's mental state is based on acts of family violence committed by the deceased against the defendant." *Osby*, 939 S.W.2d at 791; *see Avila*, 954 S.W.2d at 841 ("[I]n order for expert testimony concerning the mental state of the accused at the time of the offense to be admissible, the expert must base his opinion in large part on the history of domestic violence between the defendant and the victim.").

Expert testimony may, however, be admissible when it negates the *mens rea* element of an offense. "[R]elevant evidence may be presented which the jury may consider to negate the *mens rea* element" of the offense, and this evidence "may sometimes include evidence of a defendant's history of mental illness." *Jackson v. State*, 160 S.W.3d 568, 574 (Tex. Crim. App. 2005). The trial court has discretion to determine whether evidence of mental illness, for example, may be presented to negate *mens rea*, or whether the evidence should be excluded on special grounds. *Id.*; *see Ruffin*, 270 S.W.3d at 587–88 ("[B]oth lay and expert testimony of a mental disease or defect that directly rebuts the particular *mens rea* necessary for the charged offense is relevant and admissible unless excluded under a specific

23

evidentiary rule."). This evidence "may also be excluded if it does not truly negate the required *mens rea*." *Ruffin*, 270 S.W.3d at 596; *see Mays v. State*, 318 S.W.3d 368, 381 (Tex. Crim. App. 2010) (stating that mental illness testimony may be relevant for mitigation purposes during punishment phase, but "expert testimony that does not directly rebut the culpable mental state usually may be excluded at the guilt stage").

## B.    Relevant Facts

As part of his case-in-chief in the guilt-innocence phase of trial, Appellant sought to introduce the testimony of Dr. Jolie Brams, a psychologist with a practice in forensic consulting, including as a mitigation specialist in capital murder cases. At a hearing outside the presence of the jury, Dr. Brams testified that she had met with Appellant on three occasions and formed an opinion concerning how violence and traumatic events that he witnessed and experienced during his childhood and adolescence affected his development and his ability to perceive and react to danger and to situations like the incident with Harvey Simmons.

Dr. Brams stated that her opinions were based on established psychological science and that extensive literature exists on how exposure to violence causes changes in the brains of children, which then impacts functioning as adults. When asked if she intended to offer testimony about Appellant's mental state at the time of the offense, she stated, "In general, but also the precursors, the developmental

24

trajectory and the issues that have—that would have lead somebody in his situation to have particular perceptions of a situation . . . and responses." She further stated that her job was to educate or inform the jury "as to how somebody with [Appellant's] life experiences may assess and react to situations in a different way than other people may do so."

The State objected to allowing Dr. Brams to testify. It did not challenge her qualifications, but instead argued that, when self-defense is at issue, the Court of Criminal Appeals has generally prohibited testimony concerning what a defendant's mental state was at the time of the offense because the self-defense statute used a reasonable person standard. The State argued that an exception exists in cases involving family violence, in which the defense may present evidence—including expert testimony—concerning the relationship between the defendant and the complainant, but this case does not involve family violence. Appellant argued that self-defense is determined from the standpoint of the actor and he was therefore entitled to present psychological testimony concerning how his upbringing had affected him to explain his decision to defend himself on the day of the shooting. Defense counsel stated that he was not raising the insanity defense or arguing that Appellant could not follow the law; instead, he sought to shed "light on the decisions that [Appellant] made that day."

Defense counsel and the trial court had the following exchange:

The Court:        Are you saying that [Dr. Brams is] going to state that [Appellant] is a reasonable and prudent person or that he reacts like a reasonable and prudent person?

Defense counsel:    I think she's going to say he reacts as a reasonable and prudent person would who's been subjected to the childhood he was.

The Court:        Well, now see, I think that's where—that's the divergent point. I think what [the prosecutor] has been arguing is that because it's a reasonable and prudent person standard, that you can't have a deviation from that for a single case or for every case.

Defense counsel:    I'm not asking to deviate from the standard. That'll be for the jury to decide about whether he was reasonable and prudent. They—you know, they could flip this—the information that they've had and the information that hopefully they'll get from Dr. Brams, they can flip it against the Defense. They can say, you know what, he's damaged by his upbringing. He's a hair-trigger guy, so we don't think he acted reasonably and prudently.

It cuts both ways. So I think it's just information that a jury is entitled to get to get a full appreciation and understanding of what happened out there that day. And they're capable of deciding whether or not he acted reasonably and prudently. I mean, I don't think this is to confuse the jury. You're going to give them their instructions on the law that they have to consider when they decide whether or not they believed he acted in self-defense.

Defense counsel further argued that Dr. Brams would testify that Appellant's life experience "affects his perception of threat situations and how he reacts to those," and therefore her testimony was relevant to whether Appellant "reasonably

26

believed it was necessary to use deadly force to defend himself." Appellant further argued that in murder prosecutions, the Code of Criminal Procedure allows both the State and the defense to offer testimony of "all relevant facts and circumstances going to show the condition of the mind of the accused at the time of the offense." The trial court again stated that it believed testimony from Dr. Brams would "start to confuse what [is] reasonable and prudent," but it allowed defense counsel to put on additional testimony from Dr. Brams before making a ruling.

Dr. Brams testified that the traumatic and violent events Appellant witnessed and experienced during his childhood and youth "plays a major role in the condition of [his] mind, his mindset, [and] psychological functioning at the time of the offense." Appellant, due to his upbringing, experienced chronic hypervigilance and "had to be on guard and on alert physically, behaviorally, emotionally, developmentally, both within his household and in the community."

Appellant also experienced violence directly—as a victim of child abuse—and indirectly—as a witness to abuse of his mother. As a result, he "lived in a situation where survival was the norm, even for the most vulnerable. And it wasn't just for himself, it's what he observed and learned about others in his environment, both in his home and his community." Appellant was exposed to violence beginning in his preschool years, and Dr. Brams testified that this exposure "puts the developing mind, a mind that is structurally changing and biologically changing, on

high alert and it changes forever the way a person is able to perceive and react to their environment."

Appellant was not able to focus on learning because he was constantly wondering what would happen at home and how safe he was in the community, and as a result, "that learning, thinking part of his brain was suppressed and the survival part of his brain was put on constant alert." The threats and exposure to violence persisted for years, from when Appellant was a small child until his teenage years. Dr. Brams testified that it is well-established in the psychological literature that adverse childhood experiences like the ones Appellant experienced "exponentially increases" chances for substance abuse, criminal behavior, mental health problems, and physical health problems in adults.

Dr. Brams further testified that hypervigilance increases physiological arousal, changes perception to the environment, and changes reactions to certain situations. Chronic hypervigilance "changes the way that the brain functions since childhood." These individuals "become overly sensitive to changes in the environment or aspects in the environment that may be perceived as dangerous." They do not perceive situations in the "typical" way, but instead "perceive things from being on guard, physiologically aroused, and relating those aspects in the environment to previous traumatic situations." Dr. Brams stated:

> But the perceptions are the world's not a safe place to be, which
> changes your perceptions and your reactivity, how you react to

situations, that no one can be trusted. So you look at the world from a defensive perspective.

The world is not a safe place, so your first thought is self protection. And that could be many things. It could be, you know, self-defense. It also could be withdrawal. It could be difficulties in relationships, whatever.

And people who have been exposed to this type of stress and are hypervigilant and fearful, do not perceive situations in the same way most of us will. It changes your perceptions.

These individuals "tend to be very tense or on guard," they are "always looking for threats," and they are "always looking for danger."

Dr. Brams opined that Appellant's state of mind on the day of the shooting "was probably the same as his mind the day before the shooting and during his adult life and child life"; that is, he had "to be ready to react immediately" and had "to survive." She emphasized that this was not a mental illness or insanity but was instead "a habitual way of having to perceive and relate to the world based upon the trauma you've experienced as a child."

Ultimately, the trial court sustained the State's objection and ruled that Dr. Brams would not be allowed to testify during the guilt-innocence phase of the trial.[4]

## C.  *Exclusion of Dr. Brams's Testimony*

On appeal, Appellant argues that the trial court erred by excluding Dr. Brams's testimony during the guilt-innocence phase of trial. He argues that the jury,

---

[4]     Dr. Brams testified during the punishment phase of trial. Her testimony included the topics Appellant had wished to present during the guilt-innocence phase.

29

in determining whether he acted in self-defense when he shot the complainants, was required to view the situation from his standpoint to determine whether he reasonably believed deadly force was immediately necessary to protect himself. Dr. Brams's testimony, which addressed how Appellant perceived his environment and potential threats due to his upbringing, "would have been extremely helpful in assisting the jury in determining whether he acted reasonably." Appellant argues that Dr. Brams's testimony was relevant and should have been admitted. We disagree.

Under the defense of self-defense, a defendant's conduct is justified if he formed a reasonable belief that deadly force was immediately necessary to protect himself from another's use or attempted use of unlawful deadly force. *See* TEX. PENAL CODE §§ 9.31–.32; *Echavarria*, 362 S.W.3d at 154. The Penal Code defines "reasonable belief" as "a belief that would be held by an ordinary and prudent man in the same circumstances as the actor." TEX. PENAL CODE § 1.07(42). This is an objective standard. *Davis v. State*, 104 S.W.3d 177, 181 (Tex. App.—Waco 2003, no pet.). The reasonableness of a defendant's belief that force was required to defend himself is viewed from the defendant's standpoint at the time he acted. *Benavides v. State*, 992 S.W.2d 511, 521 (Tex. App.—Houston [1st Dist.] 1999, pet. ref'd). Thus, "[a]lthough the jury employs an objective standard to determine the reasonableness of the defendant's belief, it must view the facts from the defendant's perspective." *Davis*, 104 S.W.3d at 181.

In the offer of proof, Dr. Brams testified that due to the violence that Appellant witnessed and experienced in his home, his school, and his community while growing up, he experienced chronic hypervigilance which affected the development of his brain and his perceptions of threats. Appellant was constantly "on guard" and "always looking for threats." She opined that Appellant's state of mind on the date of the shooting "was probably the same as his mind the day before the shooting and during his adult life and child life"; he had "to be ready to react immediately" and had "to survive."

Appellant's trial testimony concerning the events that occurred at the car wash raised the issue of self-defense. However, Dr. Brams's testimony did not address how an ordinary and prudent person would react to this situation or whether an ordinary and prudent person would have formed a reasonable belief that deadly force was immediately necessary to protect himself from another's use of force. Instead, her testimony addressed how repeated violent encounters during childhood and adolescence—such as the ones Appellant experienced—can affect a person's brain structure and their perceptions and reactions. This testimony is relevant to whether Appellant *subjectively* believed that deadly force was immediately necessary. But it is not relevant to the question whether Appellant, when faced with the situation at the car wash, formed a reasonable belief—that is, "a belief that would be held by an ordinary and prudent man in the same circumstances"—that deadly force was

31

immediately necessary to protect himself from the complainants' use or attempted use of deadly force. *See Werner v. State*, 711 S.W.2d 639, 645–46 (Tex. Crim. App. 1986) (concluding that trial court did not err in excluding expert testimony of psychiatrist who would have testified that defendant, who was child of Holocaust survivor, was affected by Holocaust Survivor Syndrome when he shot complainant because evidence "only tended to show that possibly [defendant] was not an ordinary and prudent man with respect to self-defense" and defendant was not entitled "to an enlargement of the statutory defense on account of his psychological peculiarities"); *Echavarria*, 362 S.W.3d at 154 (holding that expert testimony concerning how trained Marine identifies and reacts to threats was properly excluded because "[h]ow a trained Marine instinctively reacts to a perceived threat is not relevant to the issue of whether an ordinary and prudent man," viewing circumstances from defendant's viewpoint, would have formed reasonable belief that deadly force was immediately necessary).

Furthermore, the trial court did not err to the extent that it determined that Dr. Brams's testimony was not admissible under article 38.36(a). Courts have repeatedly held that expert testimony concerning a defendant's state of mind at the time of the offense is inadmissible. *See Fairow*, 943 S.W.2d at 899; *Jackson*, 548 S.W.2d at 692–93; *Avila*, 954 S.W.2d at 839, 841; *Osby*, 939 S.W.2d at 791. Although article 38.36(b) permits expert testimony regarding the condition of the defendant's mind

relating to family violence in murder prosecutions in which a justification defense—such as self-defense—is raised, it is undisputed that this case does not involve family violence. Our sister courts have held that in murder prosecutions that do not involve family violence, article 38.36 does not permit expert testimony concerning the defendant's state of mind at the time of the offense. *See Avila*, 954 S.W.2d at 841; *Osby*, 939 S.W.2d at 791.

Additionally, although the Court of Criminal Appeals has allowed admission of expert testimony, including evidence of a defendant's history with mental illness, when it negates the *mens rea* element of the charged offense, *see, e.g.*, *Ruffin*, 270 S.W.3d at 587–88, nothing in Dr. Brams's testimony negates the *mens rea* elements of the charged offenses of capital murder and murder. At most, Dr. Brams's testimony explains why Appellant perceived the complainants to be a threat to him. Her testimony does not "directly rebut" the culpable mental states for the charged offenses. *See Mays*, 318 S.W.3d at 381 ("All of [the defendant's] mental-illness evidence showed why he intentionally and knowingly killed the deputies: He was paranoid and thought they had 'mistreated' him. But motive is not an element of murder or capital murder. Such mental-illness testimony may be relevant for mitigation purposes during the punishment phase, but expert testimony that does not directly rebut the culpable mental state usually may be excluded at the guilt stage.").

We conclude that the trial court's decision to exclude Dr. Brams's testimony during the guilt-innocence phase of trial was not outside the "zone of reasonable disagreement." *See Beham*, 559 S.W.3d at 478; *see also Echavarria*, 362 S.W.3d at 154 (concluding that trial court's decision to exclude expert testimony concerning how trained Marines react to perceived threats was not outside zone of reasonable disagreement); *Avila*, 954 S.W.2d at 841 (concluding that trial court properly excluded expert testimony concerning defendant's training with handguns and effect of this training on defendant's mental state in committing offense). We hold that the trial court did not abuse its discretion in excluding this testimony.

We overrule Appellant's second issue.

## Mistake of Fact Instruction

In his third issue, Appellant argues that the trial court erred by denying his requested jury instruction on the defense of mistake of fact. Specifically, Appellant requested an instruction that the jury should acquit him if it believed, or had a reasonable doubt, that Appellant "acted under a mistake of fact, that is, a reasonable belief that he was mistaken that deadly force was immediately necessary to protect himself against" the complainants.

### A. Standard of Review

The first step in analyzing a jury charge issue is to determine whether error in the charge exists. *Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005). If we

find that error occurred, we then analyze that error for harm. *Id.* When, as here, the defendant timely objected at trial to the error, we will reverse upon a showing of "some harm" to the defendant. *Chambers v. State*, 580 S.W.3d 149, 154 (Tex. Crim. App. 2019). "This means that 'the presence of *any* harm, regardless of degree, . . . is sufficient to require a reversal.'" *Id.* (quoting *Arline v. State*, 721 S.W.2d 348, 351 (Tex. Crim. App. 1986)). The defendant must have suffered some actual—as opposed to merely theoretical—harm. *Id.*; *see Jordan v. State*, 593 S.W.3d 340, 347 (Tex. Crim. App. 2020) ("'Some harm' means actual harm and not merely a theoretical complaint."); *French v. State*, 563 S.W.3d 228, 239 (Tex. Crim. App. 2018) ("[W]here a record reveals a risk of harm that is so small that it may properly be characterized as not remotely significant, or where the risk of harm is almost infinitesimal, any harm resulting from the error is only theoretical harm.") (internal quotations omitted). Reversal is required if the error was calculated to injure the rights of the defendant. *Jordan*, 593 S.W.3d at 347. When assessing harm, we evaluate the entire record, including the jury charge, contested issues, weight of the probative evidence, arguments of counsel, and other relevant information. *Id.*

The trial court shall deliver to the jury "a written charge distinctly setting forth the law applicable to the case." TEX. CODE CRIM. PROC. art. 36.14. A defendant is entitled to an instruction on any defensive issue that is raised by the evidence, regardless of the strength or credibility of the evidence. *Jordan*, 593 S.W.3d at 343;

*Allen v. State*, 253 S.W.3d 260, 267 (Tex. Crim. App. 2008) ("The appellant is, of course, entitled to an instruction on every defensive issue raised by the evidence, 'whether that evidence is weak or strong, unimpeached or uncontradicted, and regardless of what the trial court may or may not think about the credibility of the defense.'") (quoting *Hamel v. State*, 916 S.W.2d 491, 493 (Tex. Crim. App. 1996)).

A defensive issue is raised by the evidence if there is sufficient evidence to support a rational jury finding on each element of the defense. *Jordan*, 593 S.W.3d at 343; *Shaw v. State*, 243 S.W.3d 647, 657–58 (Tex. Crim. App. 2007) (stating that defense is raised by evidence "if there is some evidence, from any source, on each element of the defense that, if believed by the jury, would support a rational inference that that element is true"). We view the evidence in the light most favorable to the defendant's requested instruction. *Jordan*, 593 S.W.3d at 343.

It is a defense to prosecution that the defendant, through mistake, formed a reasonable belief about a matter of fact if his mistaken belief negated the kind of culpability required for commission of the offense. TEX. PENAL CODE § 8.02(a); *Flores v. State*, 573 S.W.3d 864, 868 (Tex. App.—Houston [1st Dist.] 2019, pet. ref'd). "By 'kind of culpability' is meant 'culpable mental state.'" *Celis v. State*, 416 S.W.3d 419, 430 (Tex. Crim. App. 2013); *Flores*, 573 S.W.3d at 868 ("'Kind of culpability' refers to the mental state required for criminal responsibility."). This defense "turns on the mistaken belief of the defendant, not others, and considers the

conduct of others only to the extent that it contributes to the defendant's belief."

*Flores*, 573 S.W.3d at 868. A mistake about the existence of a fact which would establish an affirmative defense to an offense, rather than negating an element of the offense, does not raise the mistake-of-fact defense. *Lugo v. State*, 923 S.W.2d 598, 601 (Tex. App.—Houston [1st Dist.] 1995, pet. ref'd).

If the evidence raises the defense of mistake of fact and the defendant requests an instruction, the trial court must instruct the jury on this defense. *Flores*, 573 S.W.3d at 868; *see Celis*, 416 S.W.3d at 430 ("When he raises evidence of a mistaken belief as to the culpable mental state of the offense, a defendant is entitled to an instruction on mistake of fact upon request."). The reasonableness of the defendant's mistaken belief is a question for the jury. *Flores*, 573 S.W.3d at 868. However, if the evidence, when viewed in the light most favorable to the defendant, does not establish a mistake-of-fact defense, an instruction is not required. *Id.*

## B.    *Entitlement to Mistake of Fact Instruction*

At the charge conference, the trial court agreed that the evidence raised the issue of self-defense and included instructions on self-defense and the use of deadly force in the jury charge.[5] *See* TEX. PENAL CODE § 9.31(a) ("[A] person is justified in

---

[5]    The jury charge also included instructions on the defense of necessity. *See* TEX. PENAL CODE § 9.22 (providing that conduct is justified if (1) actor reasonably believes conduct is immediately necessary to avoid imminent harm; (2) desirability and urgency of avoiding harm clearly outweigh, according to ordinary standards of reasonableness, harm sought to be prevented by law proscribing conduct; and

using force against another when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force."), § 9.32(a) (providing that person is justified in using deadly force against another if actor would be justified in using force and actor reasonably believes deadly force is immediately necessary to protect against other's use or attempted use of unlawful deadly force).

Appellant also requested the following instruction on the defense of mistake of fact:

> You are instructed that as a defense to prosecution a person through mistake formed a reasonable belief about a matter of fact if his mistaken belief negated the kind of culpability required for the commission of the offense. Reasonable belief means a belief that would be held by an ordinary and prudent person in the same circumstances as the defendant.

> So if you find from the evidence in this case that at the time the defendant, LaMelvin DeWayne Johnson, if he acted under a mistake of fact, that is, a reasonable belief that he was mistaken that deadly force was immediately necessary to protect himself against Johnny Simmons's, Harvey Simmons's, or Donntay Borom's use of deadly force or if you have a reasonable doubt thereof, you will acquit the defendant.

> If you find from the evidence beyond a reasonable doubt that at the time and place in question, the defendant did not reasonably believe that he was mistaken that deadly force was immediately necessary to protect himself against Johnny Simmons's, Harvey Simmons's, or Donntay

---

(3) legislative purpose to exclude justification claimed for conduct does not otherwise plainly appear). Additionally, the trial court instructed the jury on the lesser-included offenses of murder and manslaughter.

> Borom's use of deadly force, then you must find against the defendant on the issue of mistake of fact.

The trial court refused to submit this requested instruction.

On appeal, Appellant points to his testimony that he was scared and thought that his life was being threatened when he shot Harvey, Johnny, and Donntay. He argues, "This is some evidence that, if believed, could be considered a mistake of fact which negated [his] culpability." However, Appellant does not dispute that he shot Harvey, Johnny, and Donntay. His belief that Harvey, Johnny, and Donntay were threatening his life, whether mistaken or not, relates to the defense of self-defense, not to the elements of the underlying offenses of murder and capital murder.

Even if we assume that Appellant correctly believed that Harvey, Johnny, and Donntay were threatening his life, this evidence does not negate the culpable mental states required for the offenses of capital murder and murder. Instead, this evidence is relevant to whether Appellant was justified using deadly force against Harvey, Johnny, and Donntay—that is, whether he acted in self-defense based on a reasonable belief that use of deadly force was immediately necessary to protect him against the others' use or attempted use of deadly force—a defense on which the trial court instructed the jury in the charge. *See id.* §§ 9.31–.32. Because this alleged mistake of fact does not negate the culpable mental state of the underlying offenses but instead relates to proof of an affirmative defense, the evidence does not raise the mistake-of-fact defense. *See Lugo*, 923 S.W.2d at 601; *Bryan v. State*, 814 S.W.2d

482, 483 (Tex. App.—Waco 1991, pet. ref'd) ("A mistake about the existence of a fact which would establish an affirmative defense to an offense, rather than negating an element of the offense, does not raise the mistake of fact defense.").

We conclude that Appellant was not entitled to an instruction on the defense of mistake of fact; therefore, the trial court did not err by refusing Appellant's requested instruction. *See Lugo*, 923 S.W.2d at 601.

We overrule Appellant's third issue.

## Conclusion

We affirm the judgment of the trial court.


April L. Farris
Justice

Panel consists of Justices Kelly, Guerra, and Farris.

Do Not Publish. TEX. R. APP. P. 47.2(b).